Odis **SOLOMON**, Plaintiff,

v.

**ROYAL OAK TOWNSHIP, a municipal corporation, Tommy Staton, Marie Turner, and Pedro Cain, Defendants.**

Civ. No. 85–71283.

United States District Court, E.D. Michigan, S.D.

Sept. 4, 1986.

Glen N. Lenhoff, Flint, Mich., Mark J. Kriger, Detroit, Mich., for plaintiff.

Kenneth L. Lewis, Detroit, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

This is a 42 U.S.C. § 1983 action with pendent claims of violations of Michigan employment contract and tort law. This court's jurisdiction is based upon 28 U.S.C. § 1343 (1957) and 42 U.S.C. § 1983 (1982), and the matter was tried by the court. This memorandum constitutes the court's findings of fact and conclusions of law. The defendants include Tommy Staton and Pedro Cain, members of the Royal Oak Township Board of Trustees; and Marie Turner, the former Township Clerk. Royal Oak Township is a small suburb contiguous to the city of Detroit, Michigan.

Plaintiff Odis Solomon, a former member of the Royal Oak Township Police Department, joined the Department in 1966 as a patrolman. Solomon's outstanding performance and leadership capabilities were rewarded by several promotions. He became Sergeant in 1968, Lieutenant in 1972; and Royal Oak Township Public Safety Director (and Chief of Police) in 1974.

Solomon was terminated from employment as Public Safety Director in January 1978. He then filed a wrongful discharge action against the Township, and in settlement of that lawsuit plaintiff resumed employment as a Lieutenant and second-in-command in late 1978.

Official corruption appears to have become a pervasive problem in Royal Oak Township, during the time span relevant to this lawsuit. When plaintiff became Public Safety Director, official corruption became one of his primary concerns. The Township apparently was in such difficulty that Judge Hilda Gage of the Oakland County Circuit Court was required to assume superintending control and issued an order in 1978 appointing a superintendent to direct administration of the Township. The Township continues to be monitored under this order and Jerry Saddler is the current superintendent. The substance of those difficulties was never explained, on this record.

As Public Safety Director, plaintiff investigated accusations of corruption which were presented against police department personnel, as well as against other officials of the Township. He also cooperated with investigations conducted concurrently by the Federal Bureau of Investigation (FBI) and the Michigan State Police. With plaintiff's assistance, the FBI had conducted an investigation of possible bribery and numbers racketeering in 1977. John Gatewood, now plaintiff's successor as Police Chief of the Township, was questioned by the FBI and testified that plaintiff had launched an investigation of him which had lasted for nine years. He expressed great bitterness about that fact.

Defendants claim that plaintiff pursued a series of unfounded complaints against Township officials, but the court notes that at least one federal conviction did result from plaintiff's activities. Between 1981 and 1984, James Hunt, a former Township Supervisor, was indicted and convicted of extortion and bribery. Defendant Marie Turner, then the Township clerk, testified against Hunt in exchange for governmental immunity for her admitted complicity in those matters.

Plaintiff also is alleged to have charged that Trustee Pedro Cain might have been involved in illegal drug transactions and that Trustee Tommy Staton resided in Detroit rather than in the Township as required by a Township ordinance, and as he fraudulently claimed. Staton did testify at trial that he does live in Detroit, and does also claim to reside in the Township in matters of record.

Plaintiff also filed a complaint with the Michigan State Police against Cecil Dawson, the present Township Deputy Chief of Police. Dawson is the former owner of "J & D Investigations," a firm which provided private security guard services in the area. Plaintiff discovered that Dawson was using the Township Police Department's radio equipment and LEIN machine in connection with his private security service and that Dawson was not filing the background reports on security guards whom he employed with the State Police as required by

state law. Although Dawson testified that he had thereafter surrendered his license to conduct such a business to the State Police because he was too busy to continue, the proofs showed that Dawson actually had surrendered his license rather than submit to a hearing on the violations of law which plaintiff had reported.

Dawson had hired one Lindsey Hamm, a man who had just been arrested by Township police officers and charged with carrying a concealed weapon (a 32–caliber gun) and with disorderly conduct. Dawson had dropped the CCW charge against Hamm and failed to process the misdemeanor charge expeditiously. He went to court and spoke on Hamm's behalf, then hired Hamm as a security guard just one week after the arrest incident. The required information concerning Hamm's hiring and background was not forwarded to the State Police, nor were the legally required fingerprints and other identification data which would have been necessary for a State Police record search. It was later revealed that Dawson had failed to advise the police of other security guard hirings, as well.

Plaintiff argued, and the evidence indicates, that his undertaking to rid the township government of corruption resulted in the development of serious hostilities against him among defendants and their associates. During this period allegations of sexual improprieties were instituted against plaintiff by three women: Barbie Logan, Sharon Gleaton and Christine Egbeleye, who were public safety dispatchers employed by the Department. At the urging of at least one of the defendants herein, these women filed grievances against plaintiff alleging sexual harassment.

Rhonda Scott, a police reserve officer, accused plaintiff of raping her. In mid–1984, defendant Staton informed William Carmody, who was the Township Superintendent, that plaintiff had raped Scott, who was Staton's sister-in-law. When Scott filed the official grievance with the Department a year later, she was an outpatient at the Clinton Valley Mental Hospital. Plaintiff admitted having consensual sexual intercourse with Scott and fondling and kissing Gleaton on and off the premises of the Department. Gatewood also, however, had intimate relationships with Gleaton and Egbeleye.

In September 1984, Staton was interviewed on television, elaborating upon the sex charges which had been filed against plaintiff, particularly his sister-in-law's charge of rape. Staton claims that he had the Board of Trustee's approval and spoke in his official capacity as a member of the Board.

Superintendent Carmody scheduled an "open workshop" about the women's charges. The Township Treasurer, Lester Maddox, Carl Miller, and defendants Turner, Staton and Cain attended the meeting. Plaintiff appeared at the hearing but did not make a comment on the charges. After the hearing, Superintendent Carmody referred the matter to the State Attorney General's Office. The Michigan State Police investigated each claim. The police report indicates that Barbie Logan and Rhonda Scott disavowed their prior complaints but that Gleaton and Egbeleye continued to maintain that plaintiff sexually assaulted them. Following a complete investigation, the State Police determined that there was insufficient evidence to institute criminal prosecution against plaintiff. The state police suggested that the women pursue their claims with the Michigan Civil Rights Commission, if they wished. Some claims were filed but they were later withdrawn. Accordingly, all of the charges came to nought.

In June of 1984 plaintiff was disabled for several months by an on-duty automobile accident. In September plaintiff returned to work and was informed that he was no longer Public Safety Director. He had been demoted to Lieutenant. In plaintiff's absence, Gatewood had been appointed as Acting Public Safety Director and the Board then voted to retain Gatewood in that position "for the smooth operation of the public safety department." Turner and others testified that the morale of the officers had been low during plaintiff's administration because the officers felt that

plaintiff was too harsh, used profanity, and did not have the respect of the department.

In January of the following year, plaintiff was again demoted from Lieutenant to patrolman, purportedly as part of a reorganization plan recommended by the Board of Trustees to rectify the top-heaviness of the Department. Plaintiff then filed this lawsuit.

Plaintiff was a patrolman when the Hamm incident occurred. On the 15th and 16th of March 1985, two articles written by reporter Lesa Doll were printed in the *Royal Oak Tribune*. Doll reported that Dawson surrendered his license after the State Police had discovered that Dawson had not provided the requisite information concerning several of his security guards, including Hamm. Plaintiff was quoted as saying, "Dawson failed to press proper charges against the man and instead hired him for his own personal gain." During that same interview, plaintiff characterized Dawson's actions as an "obstruction of justice" and "totally ridiculous." Plaintiff was also interviewed by a radio reporter.

When Chief Gatewood became aware of this publicity, he reprimanded plaintiff and forbade him from further communications with the media without prior authorization from his superiors. Gatewood also informed plaintiff that any further contact with the media would result in plaintiff's dismissal. Plaintiff testified credibly that he obeyed this order. Unfortunately, plaintiff's radio interview was rebroadcast after plaintiff was reprimanded by Gatewood.

Chief Gatewood wrote to Superintendent Saddler and the Board charging that plaintiff had violated the rules and regulations of the Department in his communications with the media. Gatewood recommended that plaintiff be terminated. No other Township employee had ever been discharged for speaking with the press, but the Board met and voted to accept Gatewood's recommendation. The Board's attorney at that meeting argued that he should be fired because, inter alia, he had demonstrated his continued defiance by filing this lawsuit. Plaintiff was terminated in April 1985.

Plaintiff was not accorded a hearing on his dismissal until his attorney in this pending action demanded one of the Board. Then the Board scheduled a hearing and notified plaintiff that his salary would not be terminated until it had determined whether the discharge should be upheld. The post-termination hearing was held on June 3, 1985 and the Board issued an opinion affirming plaintiff's dismissal on August 1, 1985.

Plaintiff had filed this lawsuit, based only upon the alleged wrongful demotion to patrolman. After the termination, he requested and received leave to amend his complaint. This action now presents allegations of violation of 42 U.S.C. § 1983, violation of the Equal Protection Clause, and the pendent state claims of violations of Michigan employment contract law, defamation, and intention infliction of emotional distress. He seeks an award of damages in the amount of $501,360 against the Township and an award of $517,660 against the individual defendants. Alternatively, plaintiff requests reinstatement, back pay and damages for the emotional distress he has undergone.

### FIRST AMENDMENT

Plaintiff has alleged violations of section 1983 on several grounds including a violation of his First Amendment right to free speech and deprivations of property and liberty interests without adherence to procedural due process requirements before he was demoted and later discharged. Section 1983 provides in pertinent part:

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...

Chief Gatewood and Gale McRipley, the former Township Supervisor, testified that

plaintiff was fired for his contact with the media about departmental matters. Gatewood's recommendation to the Board did state that plaintiff should be terminated for his "total disregard for the Department Rules and Regulations". Those cited all relate to the publication of information concerning Deputy Police Chief Cecil Dawson's conduct of his security guard service and in the Hamm arrest.

Gatewood accused plaintiff of violating five rules contained within the Public Safety Rules Manual which is distributed to all township public safety employees. Plaintiff argues that those rules were too vague for a reasonable person to understand. In the past, he had complained to his superiors about the vagueness of the rules and had requested that the rules be rewritten. The rules are indeed vague and overbroad.

Section 5.9 provides that "[a] member shall treat as confidential all official business of the department. A commanding officer may impart information to official representatives of the press providing the case is not classified as confidential." Defendants testified that plaintiff had violated this rule in discussing the Hamm case, which was "official business" within the meaning of section 5.9.

The United States Court of Appeals for the Seventh Circuit examined a rule which required the employees of the Caledonia, Wisconsin Police Department to "treat as confidential the official business of the department," a rule which is identical to the one promulgated by the Royal Oak Township officials. *O'Brien v. Town of Caledonia,* 748 F.2d 403 (7th Cir.1984). In *O'Brien,* a police officer had criticized the dismissal of citations against lawbreakers in conversations with his attorney, the local District Attorney, the chief judge of the county court, the FBI and the media. The Court of Appeals relied on its previous decision in *Hanneman v. Breier,* 528 F.2d 750, 755 (7th Cir.1976), and held that the confidentiality rule violated the first amendment as defendants had failed to show that the " 'state interest in confidentiality applicable on these facts [outweighed] the public and individual interests

in the particular statement made.' " 748 F.2d at 407, *quoting Hanneman,* 528 F.2d at 754. The *Hanneman* rationale was:

> Of course, department discipline may be undermined when police officers disobey an official regulation and an express order not to disclose police business. The department's general interest in discipline alone, however, does not outweigh the individual and public interest in the subject of plaintiff's [disclosure]. 528 F.2d at 755.

The *O'Brien* court ruled that the public has a special interest in the dissemination of information in regard to the operation of its government, especially when one of its official leaders is suspected of corruption. As such, these communications are "deserving of vigilant protection by the First Amendment." 748 F.2d at 407–08.

■ The United States Supreme Court declined to set a rigid standard for determining whether an individual's speech should be protected under the First Amendment in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). A school teacher criticized the Board's allocation of school funds and its method of notifying taxpayers that additional revenue was needed. The Court did rule, however, that the trier of fact should strike a balance between "the interest of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. at 1734. A public employee does have the right, as a citizen, to comment on matters of public concern.

The High Court also held that the employee's statement should be examined to determine whether it was directed towards a person with whom plaintiff would normally be in contact on a daily basis. If so, the statement could affect the ability of the employee's superior to maintain discipline or harmony among the employee's coworkers. *Id. Pickering,* 391 U.S. at 570, 88 S.Ct. at 1735. Finally, the court must consider the truthfulness of the statement. The Supreme Court examined this teacher's

statements and concluded that the requirement of additional funds for the school system was a question of legitimate public concern and "absent proof of false statements knowingly or recklessly made by the [public employee], [the employee's] exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Id.* at 574, 88 S.Ct. at 1738.

In the instant case, defendants allege that plaintiff was in daily contact with Deputy Chief Dawson, the superior officer whom he had publicly critized. The Department consisted of eleven employees, making it difficult for plaintiff and the Deputy Chief to avoid contact with each other. There was no showing, however, that departmental management had been or would be disrupted by plaintiff's speech.

McRipley, Saddler, Gatewood and Dawson vehemently claimed that plaintiff's statements were made in defiance of the chain of command and disrupted the harmonious atmosphere at the Department. They testified that plaintiff should have approached Dawson, Chief Gatewood, the Township Superintendent or the Township supervisor, all of whom were his superiors, before he went to the press.

This rule of the chain of command allegedly requires an officer who observed a superior officer breaking the law to first inform that officer's immediate supervisor. Then the officer would proceed, if necessary, to the next higher officer in charge until the highest official of city government had been advised of the problem. No defendant was able to cite a Township edict which supported this contention. Chain of command is mentioned only once at section 2.4 of the departmental regulations and that reference is to the chain of command which must be followed at the scene of a fire.

■ To follow such a chain of command under these circumstances would have been futile. Defendants Gatewood and Dawson had been close friends for many years. A few days after Gatewood was appointed as Acting Public Safety Director, he asked the Board to promote his old friend to the position of his Deputy Chief and the recommendation was immediately adopted at a meeting of the Board. All concerned had a history of disfavoring plaintiff's pursuit of internal corruption, and all concerned had already participated in his gradual demotion from the highest to the lowest position in the Department because of his efforts.

"A policy which would compel public employees to route complaints about poor departmental practices to the various officials responsible for those practices would impermissibly chill such speech." *Czurlanis v. Albanese,* 721 F.2d 98, 106 (3d Cir.1983). It was obvious to plaintiff that his superior officers could not be expected to resolve his charges in an unbiased manner. Their trial testimony regarding each other and their business and personal affairs was totally incredible. For example, Gatewood denied any knowledge whatsoever of Dawson's security guard business although it was operated from Dawson's home, which was located two houses away from Gatewood's home. It was also, as previously noted, operated from police headquarters.

The United States Court of Appeals for the Eighth Circuit issued an opinion on this question two years ago in *Brockell v. Norton,* 732 F.2d 664 (8th Cir.1984). In that case, a radio-operator dispatcher had been terminated from the Marveal, Arkansas police force for reporting another officer's misconduct to someone outside the department's chain of command. As in the case at bar, the chain of command was not written. The court reviewed the superiors who formed the links in that chain of command and the content, manner, timing and place of the officer's report and decided that the officer's comment was protected by the First Amendment. The officer accused of wrongdoing had obtained a copy of a test which was used for certification of officers. The plaintiff had notified the chief of police who failed to act within ten days, so plaintiff had then placed an anonymous telephone call to the officer who would administer the examination. This officer was not a member of plaintiff's department. The court held that the chain of command was

meaningless, as the officer who possessed the test was receiving preferential treatment from the Mayor, who would have prevented the chief of police from disciplining the officer. In addition, the plaintiff had chosen an even less disruptive method of apprising the test administrator. The court ruled that the plaintiff's report was protected speech because "the public has a vital interest in the integrity of those commissioned to enforce the law." *Id.* at 668.

The defendants in this case also claim that the negative publicity which plaintiff generated in the Hamm incident damaged the Township's reputation. Indeed, such publicity is damaging, but defendants are not entitled to secrecy in governmental corruption. Moreover, it appears that the Township had already received far worse publicity surrounding Mr. Hunt's federal conviction and Mrs. Turner's complicity. The accusations of sexual harassment and rape against plaintiff also had been widely publicized by the defendants without concern for Township reputation. Tommy Staton, a member of the Board of Trustees, said that he participated in his television interview about the charges against plaintiff with the Board's approval. Moreover, there was no tangible evidence of any departmental disruption during the very brief period between plaintiff's final press coverage and his discharge.

Defendants further claim that plaintiff's involvement in criminal investigations with the FBI and the Michigan State Police had generated disharmony among the members of the Department. Again, harmony is no higher a value than lawfulness, and no actual disharmony, aside from defendants' displeasure, was shown.

Defendants state that plaintiff attacked Dawson's integrity as a police officer and falsely accused him of committing a crime. Plaintiff was entitled, however, to behave as he did. The defendants rely upon section 5.24(b) of the Public Safety Rules and Regulations. That section presents a litany of offenses for which an employee may be reprimanded, suspended, demoted, dismissed or otherwise penalized. Section 5.24(b)13 prohibits "making a false state-

ment or report." Defendants have applied this rule to plaintiff's allegedly false accusations, as reported by the media. Even if this rule is otherwise applicable to plaintiff's statements herein, the information plaintiff related to the press was not false. Significantly, the Township never even asked the reporters involved what plaintiff had said to them, or when. The court's only evidence in that regard is plaintiff's own highly credible testimony.

Lindsey Hamm had been charged for a lesser crime than possible at Dawson's behest. Dawson had gone to the court to speak on Hamm's behalf, and Dawson had hired Hamm (and others) and failed to make the required reports.

Dawson acted in his own interest when he hired Hamm ten days after Hamm's arrest and failed to submit Hamm's fingerprints to the State Police, knowing that a check of Hamm's record could result in disapproval of his employment, or worse. Dawson's testimony here was evasive and incredible. He stated that Hamm could not have been charged with Carrying a Concealed Weapon because he was dressed in his uniform and carried a gun in a shoulder holster, under the uniform jacket. The weapon was undisputedly concealed, however. It is also undisputed that Hamm had left the post to which he was then assigned as a security guard and gone across the street to drink beer in a doorway. The .33 caliber gun he carried was hidden in a holster underneath his jacket. Michigan law requires that the weapon be in plain view. M.C.L.A. § 750.227 (1974). *See also, People v. Charron,* 220 N.W.2d 216, 54 Mich.App. 26 (1974). A private security guard is not permitted to carry a concealed weapon unless he has a license to do so. 5814 Op.Att'y Gen. 1071 (1980). It is noteworthy that Hamm became available for new employment, after that incident.

■ Plaintiff's statement that Hamm should have been charged with CCW was not false. The *O'Brien* court held that the whistle-blower's *perception* of "potential graft and corruption" was protected and that it does not matter that the statements

are later proven to be inaccurate. 748 F.2d at 407.

The newspaper article upon which defendants rely indicated that Dawson had said that he gave up his license because he had not provided the paperwork to the State Police. At trial, he insisted that he relinquished his license because he did not have time to operate the business. Dawson was no more truthful with the State Police than he was, under oath, in this court. In a report following the investigation of the Hamm incident, the State Police indicated that when Dawson was first questioned about employing Hamm, Dawson told police that Hamm had never worked for him. But when the State Police questioned Dawson again, he admitted that he had lied. The police report also shows that Dawson felt that it would be less embarassing if he surrendered his license rather than face a hearing in the state capitol concerning his wrongdoings, and still probably lose his license. The claim of plaintiff's filing a false report is not supported by the evidence. In fact, there is overwhelming evidence that plaintiff's statements are accurate. Dawson, a man unfit to manage a security guard service, remains nevertheless, as Deputy Chief of Police of Royal Oak Township.

■ The paramount question before this court is whether plaintiff's speech was related to a personal difference of opinion or an issue of general public concern. Defendants concede that governmental corruption is a matter of public concern but claim that plaintiff manufactured his allegations. We know that the allegations were not fabricated. The Supreme Court has consistently held that a public employee's speech related to matters of public concern is protected. *Connick v. Myers*, 461 U.S. 138, 145, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982). Justice Brennan has written that "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964).

In *Connick*, the court followed *Pickering* and held that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, forum and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690. In the case at bar, plaintiff was not merely ventilating his dissatisfaction about the Hamm incident. He was informing the public that Dawson was not fulfilling his responsibilities as Deputy Chief of the Township, and was unworthy of that office, having a demonstrated venal disregard for the law. The Supreme Court held that defendant Myers' speech was not protected because she "did not seek to inform the public that the District Attorney's Office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases. Nor did Myers seek to bring to light actual or potential wrongdoing or breach of public trust on the part of [her superiors]." *Id.* at 148, 103 S.Ct. at 1690.

The citizens and taxpayers of the Township have a strong interest in the matters which plaintiff brought to light. As to the forum, there was no evidence whatsoever that plaintiff initiated the communications with the press.

Having found that plaintiff's speech related to a matter of public concern, the court must now determine whether it contributed to his discharge. *Connick*, 461 U.S. at 149, 103 S.Ct. at 1691. It is undisputed that plaintiff Solomon was dismissed because he spoke with radio and television reporters.

■ Finally, *Connick* requires that this court determine whether plaintiff's termination was otherwise justified. The court finds that plaintiff's termination was totally unjustified. In addition to the aforementioned rules which plaintiff allegedly violated, defendants claim that plaintiff violated sections 5.24(b)7, "insubordination or disrespect to a superior officer," 5.24(b)17 "gossiping about a member of the Department concerning his personal character or conduct, which is detrimental to such member;" and 5.24(b)19 "communicating or giv-

ing information to any person concerning the business of the department, which is detrimental to the department." Plaintiff did not violate section 5.24(b)7. He gave persuasive and uncontradicted testimony that he did not disobey Chief Gatewood's order not to speak to the press again without permission. Unfortunately, his interview continued to be rebroadcast. Section 5.24(b)19 is vague and the meaning of "official business" as used in this section and section 5.9 is unclear. Section 5.24(b)17 is so vague that even McRipley so acknowledged and was unable to define "gossiping" himself.

■ The vagueness and overbreath doctrines were unquestionably violated here. These rules, like those of *O'Brien*, are overbroad and unconstitutional on their face because they "prohibit all criticism of the Department regardless of the context, forum or public interest involved. The First Amendment protects a wide spectrum of such activity based not only on the policeman's right to express his views but also on the public's interest to be informed of the operations of its government." *O'Brien*, 748 F.2d at 406.

Plaintiff was dismissed for violation of vague and unconstitutional rules. A close examination of the rules and the facts reveal, that plaintiff did not return to the press after he was reprimanded, he did not falsely accuse Dawson of wrongdoing, the chain of command was a farce and plaintiff's statements did not contribute to disharmony in the public safety department. "[G]overnmental bodies may not restrict the flow of information to the public solely on considerations of discipline or internal operating procedures." *O'Brien*, 748 F.2d at 408.

Defendants cite *Cooper v. Johnson*, 590 F.2d 559 (4th Cir.1979), to demonstrate that plaintiff's statements were not related to matters of public concern, but that case is inapposite. The deputy sheriff in that case composed a letter to the local newspaper stating that the newspaper had erroneously reported that one investigator had single-handedly solved a burglary case. The gist of the deputy's letter was that other offi-

cers also helped and the deputy named those persons. The court ruled that publication of the letter would disrupt the harmony of the eleven-man office because the contest for favorable notice would cause dissension between the officer who had been named in the first story and those named later. The court further held that this was not a matter of public debate but served plaintiff's own interests in obtaining credit for solving a case. *Id.* at 562.

## DUE PROCESS

The remainder of plaintiff's section 1983 claims involve alleged violations of his liberty and property interests when he was first demoted and then discharged without a hearing. "To trigger the application of due process concepts, there must be both governmental action and the deprivation of a 'life, liberty, or property' interest to warrant constitutional protection." *Banks v. Block*, 700 F.2d 292, 295 (6th Cir.1983). Plaintiff does have a property interest in continued employment "absent cause for discharge." *Loudermill v. Cleveland Board of Educ.*, 721 F.2d 550 (6th Cir.), *aff'd*, 470 U.S. 532, 105 S.Ct. 1487, 1491–93, 84 L.Ed.2d 494 (1983). He also has a liberty interest in maintaining his reputation as a man of integrity in his community. *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

Property interests are created by state law. They do not evolve from the Constitution. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). However, an individual may not be deprived of such a right, when it exists, without notice and an opportunity to be heard. *Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971). The employee's interest in retaining employment as a means of livelihood is not outweighed by the government's interest in the expeditious removal of unsatisfactory employees. *Cleveland v. Board of Educ.*, 105 S.Ct. at 1490. The Court explained that the employee may have difficulty finding new employment with the stigma of this termination in his employment records and that a hearing will be

beneficial for both parties since dismissals often involve factual issues. If the plaintiff is given a chance to present his arguments, the decisionmaker would be more likely to make an accurate decision.

It is undisputed that plaintiff Solomon was not given a pretermination hearing. Notice and opportunity to be heard are paramount where the employee's "good name, reputation, honor, or integrity is at stake." *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971).

The Michigan Supreme Court has held that when an employer tells his employee that he will continue to be employed so long as he performs satisfactorily he may not discharge that employee without good cause. If the employee is terminated without good cause, he may maintain an action in contract for a wrongful discharge based upon the express agreement to terminate for cause only. *Toussaint v. Blue Cross,* 408 Mich. 579, 610, 292 N.W.2d 880 (1980). Plaintiff asserts that he had an oral and a written contract. The written contract was contained in section 5.24(b) which sets forth the reasons for termination. Plaintiff argues that the section implies that if he does not commit any of the offenses listed in that section, he would not be terminated.

Plaintiff also has a property interest based upon the oral representations of Pedro Cain and Superintendent Carmody. Cain and Carmody told plaintiff that he would keep his job as long as he performed it well. Plaintiff had a right to rely upon these claims. Plaintiff apparently performed well as Public Safety Director. He held that position for a four-year term and was asked to work as Acting Public Safety Director twice. Prior to that time, he received regular promotions. The only complaints which defendants have recorded against plaintiff are those discussed herein. Supervisor McRipley and Superintendent Saddler testified that there was an unwritten policy of the Township that nonunion employees would retain their positions so long as they did a good job.

■ Under all the circumstances here, plaintiff was entitled to discharge for cause only and should have received a pretermination hearing. He had a property interest in the position and defendants did violate his right to due process by failing to give him notice and an opportunity to be heard before he was terminated.

■ As to the liberty interest involved, plaintiff has alleged and proven that he was terminated for allegedly violating Township ordinances and that his good name, reputation, honor and integrity were impugned when the alleged reasons for his termination were made known to the public. That interest was violated when plaintiff was not afforded a hearing. *See Bishop v. Wood,* 426 U.S. 341, 344–48, 96 S.Ct. 2074, 2077–79, 48 L.Ed.2d 684 (1976).

■ Plaintiff also had been demoted without a hearing. He was demoted after 19 years of service from Lieutenant to patrolman as a result of a "reorganization plan" which was an obvious sham. One person with less seniority than plaintiff was allowed to remain a sergeant because, allegedly, the collective bargaining agreement prevented a sergeant's demotion. The union contract clearly demonstrates the falsity of that argument. The only person negatively impacted by the "reorganization" was plaintiff. Two Lieutenant positions were eliminated, but a comparable position in was found for the other Lieutenant.

## DEFAMATION

Plaintiff filed his claim of defamation against defendant Tommy Staton because of the accusations of rape which Staton made against him on television. Plaintiff was at home watching the news when he saw the broadcast. He testified that when the reporter asked Staton about alleged rape charges, Staton responded that plaintiff *had* raped his sister-in-law. Staton denies this statement. He says that he told the reporter that an allegation of rape had been filed. Neither party produced a tape or a transcript of the interview so the court must rely upon its observation of the witnesses and review of other evidence to determine whether plaintiff has established

a prima facie case. Staton, who admitted his untruthfulness in other matters, was not credible. The elements of defamation consist of proof that defendant made a false and defamatory statement concerning plaintiff; the unprivileged publication to another person; fault beyond negligence on the defendant's part and special harm caused by the publication. *Postill v. Booth Newspapers, Inc.*, 325 N.W.2d 511, 118 Mich.App. 608, 618 (1982).

The *de bene esse* testimony of Superintendent Carmody is helpful here because he testified that Staton had come in to his office accusing plaintiff of raping Scott. Staton could then have stated that plaintiff was the subject of an investigation on such charges, a true fact which would not constitute defamation, but did not do so. *Jones v. Schaeffer*, 332 N.W.2d 423, 122 Mich. App. 301 (1982).

▇▇▇ Staton's statement was false, however, and obviously defamatory. Although Rhonda Scott had claimed that plaintiff had raped her, she disavowed her claim in June 1984 when she was telephoned by the State Police. Staton's interview took place in September, months after her retraction. Staton admits that the only information he ever had was Scott's statement, a woman whom he knew had been hospitalized for a mental disability, and who also had retracted her charge. Staton, of course, bore a strong animus against plaintiff because of plaintiff's residency investigation.

The interview was telecast to a large viewing audience. Undisputedly, there was an unprivileged publication to a third party.

Plaintiff and his family suffered severe emotional and physical distress as a consequence of this publication. Plaintiff was deeply disturbed because his reputation at work and in the community was damaged. His wife and children no longer trusted him. He observed their anguish as he watched them cry together. Plaintiff had been an avid churchgoer and active member of the congregation, but he could not thereafter face his fellow parishioners and members of the community, and has become withdrawn.

Staton avers that he is protected against this claim by a qualified immunity. He testified that the interview was held with the Board's approval and during the time when a regular Board meeting would have been scheduled. State officials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Staton's conduct, however, did constitute clear defamation, of which any reasonable person would have known. He made an accusation of crime, publicly, knowing that the alleged victim had recanted.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiff makes this allegation against defendants Staton, Turner and Cain as a result of their conspiracy to invent and press sexual harassment and rape charges against plaintiff and their vote to demote him. The Restatement (Second) of Torts § 46 (1977) describes a tortfeasor who may be liable for an action in intentional infliction of emotional distress as "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress, and if bodily harm to the other results from it, for such bodily harm." *See also Ledl v. Quik Pik Food Stores, Inc.*, 349 N.W.2d 529, 133 Mich.App. 583, (1984). The defendant's conduct must be outrageous, shocking and intolerable within a civilized community. *Rosenberg v. Rosenberg Bros. Special Account*, 351 N.W.2d 563, 34 Mich.App. 342 (1984).

Each of these individuals did have a motive to remove plaintiff from office. Staton was being investigated for fraud for living in Detroit rather than in the township. At trial, he testified that he did indeed live in Detroit and did indeed misrepresent the facts of the matter. If he had lost the office to which he was elected for this infraction, he would have lost the income of $11,000 he received per annum as a mem-

ber of the Board of Trustees. If he had been prosecuted, the results would have been more serious.

Pedro Cain had been the subject of an investigation of drug trafficking. He denied any such connection but his testimony was the most incredible of all witnesses here. He was unable to recall the answer to any question not asked him by his own attorney.

Turner had been another "victim" of plaintiff's attempts to clean up his Township. She was prosecuted with James Hunt and had testified against him in exchange for immunity. Barbie Logan indicated in her statement that Turner had urged her to file a sexual harassment complaint against plaintiff. Superintendent Carmody testified that defendants Turner, Cain, Staton, Gatewood and Dawson had campaigned for plaintiff's removal from office in 1984.

Plaintiff alleges that his relationship with his family and the community deteriorated because of the allegations of sex crimes. His family did not trust him, and alienated him. He became deeply depressed and lonely because of the disgrace and because he was unemployed for almost a year. Other law enforcement agencies were not willing to hire a 48-year old man who was incapable of performing agility tests at levels which new police officers are now expected to achieve.

▪ Plaintiff has not, however, successfully proven intentional infliction of emotional distress. There is enough evidence to infer that these defendants probably felt malice toward plaintiff, but the evidence is insufficient to demonstrate that they conspired to have all of these women bring sexual harassment and rape charges against plaintiff. The fact that Turner urged Logan to file a complaint is not alone dispositive. It was Turner's civic duty and responsibility as Township Clerk to see that allegations of this nature are properly resolved, if they were made and she believed they were true. That fact remains unclear. Plaintiff has not demonstrated that any of the other defendants coaxed the women into filing false complaints

against plaintiff. The complaint for intentional infliction of emotional distress must be dismissed.

### RIGHT OF ACCESS

Plaintiff contends that the Township has infringed his constitutional right of access to the courts which is protected by the Equal Protection Clause of the Constitution. The ground for this allegation is that plaintiff's dismissal was partially based upon the fact that this lawsuit was filed. All people have the right to "petition the Government for redress of grievances." *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972). Plaintiff complains that terminations based upon filing of lawsuits create a chilling effect upon other employees seeking the remedies to which they are entitled.

Plaintiff had filed one other lawsuit in 1978 which resulted in regaining his job. This lawsuit had been filed after plaintiff's demotion but before his termination and it was mentioned in the Township attorney's termination recommendations to the Board as one additional reason for his discharge. "Where ... the plaintiff claims that he ... was unlawfully discharged [for filing a lawsuit], plaintiff has the burden of proving that the filing [of the lawsuit] was a significant factor in defendant's decision to discharge plaintiff." *Goins v. Ford Motor Co.,* 347 N.W.2d 184, 131 Mich.App. 185, 198 (1983).

▪ Plaintiff was then terminated less than one week after this second lawsuit was filed, and the lawsuit was admittedly a determinative factor. Defendants each acknowledged that they relied upon their attorney's report when they upheld plaintiff's discharge. That report recommended discharge because, inter alia, of his "defiance" in filing this lawsuit.

### DAMAGES

Plaintiff has requested damages totaling $501,360 against the Township and $517,-660 against the individual defendants jointly and severally.

Although plaintiff had reached the position of Chief of Police of Royal Oak Township before the events discussed herein, he has been unable to find employment which would pay a salary even comparable to the $15,000 which he earned in his last assignment as a patrolman. Each year, that amount is increased by five percent. Plaintiff is currently employed by the Pelican Security Co. He receives a weekly salary of $165.00. He has none of the job security or the fringe benefits which he enjoyed as an employee of the Township. Those included health insurance benefits, vacations, and the pension for which he would have been eligible within only four more years after the wrongful discharge.

Plaintiff requests damages for his wrongful demotion from Public Safety Director. As Public Safety Director plaintiff received an annual salary of $18,500 and the salary he earned as a patrolman from January to August 1, 1985 was over $2,000 less. Plaintiff's actuary testified that, taking into consideration plaintiff's age, the benefits he would have received as a member of the police force in Royal Oak Township, and the compensation which plaintiff receives now, plaintiff is entitled to $147,749.55 in lost wages.

Plaintiff also claims $28,640 for emotional distress subsequent to his discharge, $16,360 in punitive damages from the individual defendants due to their reckless and wilful acts and $33,640 from the Township.

Alternatively, plaintiff requests reinstatement. Reinstatement is an available remedy as noted in *Banks v. Burkich*, 788 F.2d 1161 (6th Cir.1986), however, this option is not always a viable one and plaintiff does not have an absolute right to reinstatement. The court must consider the effect upon others of such a reinstatement. *Id.* at 1164. Defendant opines that it may be difficult for plaintiff to return to the Department because there is such a difference of opinion between plaintiff and other ranking members.

This court concludes that under the circumstances, plaintiff must be reinstated with full back pay. All benefits, including his lost seniority and pension rights must be restored. As plaintiff's position as Lieutenant was eliminated pursuant to a totally sham reorganization plan, he should be reinstated at a level no lower than that, and compensated from that point. A conscientious command officer in this Township's Public Safety Department will be a great blessing.

This court has found that defendant Tommy Staton defamed plaintiff with false charges of rape. For this offense, the court awards damages in the amount of $10,000 against Tommy Staton only.

IT IS SO ORDERED.