**Norman C. HADAD, Plaintiff,**

v.

**Alvin T. CROUCHER, et al., Defendants.**

**No. 1:87 CV 1211.**

United States District Court,
N.D. Ohio,
Eastern Division.

Jan. 28, 1997.

**1232**

Stephen W. Gard, Kevin J.M. Senich, Cleveland, OH, for Norman C. Hadad.

Christopher L. Gibbon, Walter & Haverfield, Cleveland, OH, John G, Peto, Reminger & Reminger, Cleveland, OH, Alvin T. Croucher.

Robert L. Musser, Christopher L. Gibbon, Walter & Haverfield, Cleveland, OH, Larry W. Zukerman, Zukerman & Daiker, Cleveland, OH, Jonathan Greenberg, Cleveland, OH, for Village of Moreland Hills, Ronald Gymer.

Robert L. Musser, Christopher L. Gibbon, Walter & Haverfield, Cleveland, OH, Larry W. Zukerman, Zukerman & Daiker, Cleveland, OH, Jonathan Greenberg, Cleveland, OH, H. Kenneth Paulett, Cleveland, OH, for Charles Clark.

## MEMORANDUM OPINION

GALLAS, United States Magistrate Judge.

Norman C. Hadad brought this action challenging his discharge from employment under 42 U.S.C. § 1983 alleging constitutional violations of his First Amendment right to free speech, Fourteenth Amendment right to substantive and procedural due process, and a state law tort of defamation. Hadad names as defendants Chief of Police Charles M. Clark, the Mayor of the Village of Moreland Hills, Alvin T. Croucher, the individual members of the Village Council who were involved in his termination from the Village's employ and the Village of Moreland Hills, itself. The parties have consented to the jurisdiction of a Magistrate Judge.

The parties have cross-motioned for summary judgment and defendant Police Chief Clark has moved for dismissal claiming Hadad has failed to state a claim upon which relief can be granted. The parties do not contest the following facts.

Hadad was employed by the Village of Moreland Hills as a police officer (patrolman) from November 1978 until his discharge on May 23, 1986. During the summer of 1985 plaintiff and his superior, Police Commander Frank Perry, participated in investigation of possible criminal activities by the Village Mayor, Alvin T. Croucher. Commander Perry also investigated defendant Chief of Police Charles Clark.

In his affidavit Hadad relates that he served in the role of a detective on the Village Police Department and that on March 1985 he was present with Commander Perry and Police Officer James Dubnick at a meeting with Ann Washington. Ms. Washington was a secretary employed by the Village of Moreland Hills and she informed the officers that Mayor Croucher regularly stole City of Cleveland water by filling his swimming pool at his private home from a nearby fire hydrant with the Village of Moreland Hills fire hose. Ms. Washington further stated to the police officers that employees of the Village Service Department would transport the fire hose to the Mayor's private home and that

their employment records would be altered or falsified to indicate that the employees were performing some other employment duty than delivering the fire hose to Mayor Croucher's private residence. That May or early June 1985 Hadad was informed by Ms. Washington that Village employees had once again delivered the fire hose to the private home of Mayor Croucher. Hadad then states that with the authorization of Commander Perry he telephoned TV8 and met with Don Olson and Carl Monday, employees of TV8, assigned to an investigative unit known as the "I Team". Hadad telephoned a TV8 mobile unit using a special telephone number previously given to him by TV8 and informed the unit that Mayor Croucher was in the act of filling his private swimming pool with the City of Cleveland water from a municipal fire hydrant. The "I Team" reporters videotaped this act, and told Hadad that they had obtained an excellent videotape. This videotape was broadcast by the television station. Also Hadad in his affidavit relates another incident in which he investigated an allegation made by an employee of the Service Department that scrap metal owned by the Village of Moreland Hills was being sold and the proceeds of the sale of scrap metal were returned in checks made payable to cash which were given to Mayor Croucher and not deposited with the Village. Hadad states that his investigation disclosed that the records of the Village contain no information that proceeds of the sale of scrap metal had ever been received by the Village of Moreland Hills. Thereafter, in August or early September 1985 with the approval of Commander Perry Hadad went to the office of the Cuyahoga County Prosecutor and informed Prosecutor John Corrigan of all the relevant facts regarding the investigation of Mayor Croucher and other employees of the Village of Moreland Hills allegedly involved in these illegal activities.

Meanwhile, on September 4, 1985 Mayor Croucher issued a letter of warning to Hadad giving him official disciplinary warning relative to deficiencies in attendance. Hadad was cited for failing to maintain a regular work schedule with numerous unexcused absences occurring in March and May of 1985, an unexcused absence on June 9, 1985 and three unexcused absences in August 1985. Hadad signed this letter of warning acknowledging receipt. This letter also admonished that future violations and/or irregularities may result in more severe disciplinary action up to and including removal from employment.

On or about October 30, 1985 a subpoena was issued and served upon Commander Perry to testify before the Cuyahoga County Grand Jury on October 31, 1985. Commissioner Perry did testify, but Hadad did not testify before the grand jury. Subsequently on November 1, 1985 both defendants Mayor Croucher and Police Chief Clark were indicted by the Cuyahoga County Grand Jury. Mayor Croucher was indicted for theft in office, petit theft, and obstruction of justice.

Hadad emphasizes that once Mayor Croucher learned that Commander Perry would be testifying before the grand jury, on October 31, 1985 the Mayor gave Commander Perry notice of the Mayor's decision to discharge him due to insubordination. A pre-termination hearing was held and appeal to the Village Council followed. On November 25, 1985 the Village Council consisting of defendants Charles Mellen, Robert Ashton, Robert Gymer, Diane Commes, Janet Narten and John Elliot convened a post-termination hearing and voted unanimously to sustain the Mayor's decision to discharge Commander Perry. Hadad testified at Commander Perry's post-termination hearing before Council on Commander Perry's behalf concerning the investigation of the Mayor's alleged illegal use of water and municipal fire hose.

The criminal case against Police Chief Clark terminated in March 1986, and the case against Mayor Croucher terminated by the end of April 1986 with their acquittal. On April 5, 1986 Police Chief Clark wrote a letter regarding activities of Patrolman Hadad bringing to his attention for the purposes of review evaluation and consideration for disciplinary measures. Hadad maintains that this letter was written at the behest of Mayor Croucher. This letter contained over 30 instances of alleged improprieties. This was followed by a letter dated May 19, 1986 from Mayor Croucher to Patrolman Hadad

**1234**

captioned "notice of charges, intention to discharge, pre-termination hearing and immediate suspension with pay." This letter cited Hadad with the following eight alleged infractions:

1. For improperly requesting and obtaining data from the LEADS [Law Enforcement Automated Data System] computer terminal in Chagrin Falls on or about August 4, 1985, concerning the traffic violation history of Charles S. Mellen which was not related to a legitimate criminal justice purpose.

2. For improperly requesting and obtaining data from the LEADS computer terminal in Chagrin Falls on or about September 17, 1985, concerning the criminal history of Antonia Hadad which was not related to a legitimate criminal justice purpose.

3. For improperly requesting and obtaining data from the LEADS computer terminal in Chagrin Falls on or about January 6, 1986, concerning the traffic violation history of Francisco DiBlasi which was not related to a legitimate criminal justice purpose.

4. For conducting outside employment of collecting delinquent accounts during 1984 and 1985 without receiving prior approval.

5. For intimidating and harassing members of the public and misusing and abusing your position as a Moreland Hills police officer in furtherance of the debt collecting business during 1984 and 1985.

6. For performing services in relation to your debt collecting business while on duty during 1984 and 1985.

7. For engaging in the unauthorized practice of law by filing pleadings with the Bedford Municipal Court on behalf of Peter DiBlasi–Peter's Store for Men and Women during the period between June 1, 1985 through November 1, 1985.

8. For improperly requesting, receiving and cashing, in January and February, 1986, a check from the Common Pleas Court for testifying at the trial of the case of *Orrico v. Geier,* Case No. 61581, when you had already requested and received compensatory time from the Village for your time testifying at that trial in November, 1985.

A pre-termination hearing was scheduled for May 22, 1986 before Mayor Croucher at the Moreland Hills Village Hall. The pre-termination hearing was held as scheduled on May 22, 1986 and on May 23, 1986 Mayor Croucher issued a "notice of discharge" stating that upon review of the charges against Patrolman Hadad and responses thereto, it was the Mayor's decision to remove him from employment from the Village of Moreland Hills as a police officer effective immediately.[1] This notice further provided that Hadad had 10 days to appeal this decision to the Village Council under the Village Charter.

The Village's Charter empowers the Mayor to discipline any officer or employee of the Village and further provides for an appeal to the Village Council as follows:

> The Mayor shall have the power to discipline, suspend, transfer, reduce in rank, and/or discharge from employment any officer or employee of the Municipality for incompetence, gross neglect of duty, gross immorality, habitual drunkenness, failure to obey orders given them by the proper authority, or for any other reasonable or just cause.

> All suspensions, reduction in rank, or removal from the department may be appealed to the legislative authority of the Village within ten days from the date of the Mayor's judgment. The legislative authority shall hear the appeal not later than its next regularly scheduled meeting. The person against whom the judgment had been rendered may appear in person and by counsel at the hearing, examine all witnesses, and answer all charges against him.

---

**1.** Hadad does not dispute that some form of pre-termination and post-termination review was afforded by municipal procedure in accordance with *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

At the conclusion of the hearing, the legislative authority may dismiss the charges; uphold the Mayor's judgment; or modify the judgment to one of suspension ..., reduction in rank, or removal from the department.

Village of Moreland Hills Ord. No.1985–25. amending Article IV § 5 of the Village Charter. Pursuant to Article IV of the Village Charter provision Section 5, as enacted in Ordinance 1985–25, Hadad appealed his discharge to the Village Council.

The Village Council at the time of Hadad's post-termination hearing was composed of the same individuals who had sat on Commander Perry's post-termination hearing. This hearing before the Village Council commenced at 7:00 p.m. on June 10, 1986 and was concluded at a second session the following evening. Hadad was represented by two attorneys at this hearing and testified on his own behalf as well as presented witnesses in his defense. Also Police Chief Clark and Mayor Croucher testified at this hearing and were cross-examined by Hadad's attorneys. At the conclusion of the post-termination hearing, the Village Council voted unanimously in support of the Mayor's discipline of "releasing Patrolman Hadad from the Moreland Hills Police Department."

Following the adverse decision by the Village Council on June 11, 1986, Hadad commenced an appeal to the Cuyahoga County Common Pleas Court pursuant to Ohio Rev. Code § 2506.01 on June 19, 1986. Pursuant to Ohio Rev.Code § 2506.01:

Every final order, adjudication or decision of any officer, tribunal, authority, board, bureau, commission, department or other division of any political subdivision of the state may be reviewed by the Court of Common Pleas by the country in which the principal office of the political subdivision is located ...

While the matter was pending in the Common Pleas Court, on August 13, 1986, the Village Council issued its 'Findings of Fact' in Ordinance 1986–60 in support of its earlier decision to terminate plaintiff.

These findings of fact were essentially the same as the grounds proposed by Mayor Croucher, except that the first ground for termination proposed by Mayor Croucher was deleted. The first ground concerned Hadad's use of the LEADS computer terminal to run a traffic history on the vehicle owned by Councilman Charles Mellen. Hadad explained at the hearing that this vehicle was parked at the Village Hall after hours and he ran a check on it for security reasons. Apparently the Village Council found this explanation satisfactory because this ground was deleted as cause for termination.

Subsequent to the filing of the transcript by the Village of Moreland Hills in Common Pleas Court in response to Hadad's appeal, Hadad filed a notice of voluntary dismissal. On October 17, 1986 the Common Pleas Court journalized its final entry that the case was, "dismissed by Pltf pursuant to Rule 41(A) of the Ohio Rules of Civil Procedure," without prejudice. Thereafter, Hadad initiated the instant federal complaint arising under 42 U.S.C. § 1983 on May 18, 1987.

*Police Chief Clark's Motion for Dismissal (Docket No. 223):*

Before addressing the parties' cross-motions for summary judgment, Police Chief Clark's motion for dismissal must first be addressed. Police Chief Clark, who initiated termination proceedings against Hadad in his April 5, 1986 recommendation to Mayor Croucher, has moved to dismiss the federal complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Police Chief Clark first contends that the allegations relating to him in the complaint do not state a claim. The allegation which Clark claims is deficient is as follows:

32. The charges against Plaintiff Norman C. Hadad, attached hereto as Exhibit "B", were based on information provided by Defendant Charles M. Clark and prepared by Robert L. Musser, Law Director, Village of Moreland Hills, with full knowledge that they were pretextual, did not constitute "just cause" and were being asserted against Plaintiff Norman C. Hadad solely in retaliation for his exercise of his right of free speech guaranteed by the first amendment to the United States Constitution.

■ The allegations in paragraph 32, to which Police Chief Clark objects, do state a claim of pretextual retaliation for his exercise in right of free speech. However, Police Chief Clark is not actually requesting such a finding. Rather he maintains that since there is attorney-client privilege against the disclosure of conversations between the attorneys Robert Musser and Christopher Gibbon who assisted in preparing the grounds for Hadad's discharge then "it logically follows that Hadad will be unable to offer any evidence as to the information provided by Clark to Mr. Musser and Mr. Gibbon in their capacity as the attorneys for the Village of Moreland Hills," and further that Hadad will be unable to prove that Clark conveyed false and pretextual information to the attorneys.

Obviously Police Chief Clark's argument is not related to the failure to state a claim upon which relief can be granted, but is a preliminary evidentiary issue. As related in the complaint, the attorneys merely followed Police Chief Clark's instructions in charging Hadad, and there is presentable evidence in the form of a signed letter from Police Chief Clark to Mayor Croucher recommending Hadad's dismissal. Nothing in this court's order dated September 26, 1996 precludes Hadad from presenting testimony of other persons not so bound by the attorney-client privilege or producing evidence concerning Police Chief Clark's recommendation. Only Clark is prohibited from divulging conversations between legal counsel in the Village and himself.

■ Police Chief Clark next argues that Hadad is prohibited from relitigating the issue of the validity of the charges brought against him by his failure to pursue his state court appeal on the issue. He maintains that the Village Council's findings were the product of a quasi-judicial proceeding, which serve as a bar to relitigation of the issues which are actually considered or which could have been considered in defense of the government administrative action. This *res judicata* issue is common to defendants' motions for summary judgment and consequently shall be addressed next. For the reasons that follow, the Village Council's findings of fact were not administrative *res judicata,* and consequently defendant Clark's motion for dismissal pursuant to Rule 12(b)(6) (Docket No. 223) is denied.

*Res Judicata:*

The concept of *res judicata* has long been a part of federal jurisdiction and this concept extends not only to federal judgments procured in the federal courts but also to judgments procured in state courts. This concept is firmly rooted in the "full faith and credit" clause of Article IV, section 1 of the United States Constitution. Moreover this concept has congressional reinforcement under 28 U.S.C. § 1738 which provides that the records and judicial proceedings of any court of any state when authenticated shall have the same full faith and credit in every court within the United States and its territories and possessions. 28 U.S.C. § 1738. Thus, federal courts are no place to relitigate matters originally determined by the state courts. Under 28 U.S.C. § 1738, "federal courts [are] to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerge would do so." *Haring v. Prosise,* 462 U.S. 306, 313, 103 S.Ct. 2368, 2373, 76 L.Ed.2d 595, 603–04 (1983); *Migra v. Warren City School Dist. Bd. of Ed.,* 465 U.S. 75, 82, 104 S.Ct. 892, 896–97, 79 L.Ed.2d 56, 62 (1984); *Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415–16, 66 L.Ed.2d 308, 314 (1980); *McAdoo v. Dallas Corp.,* 932 F.2d 522, 524 (6th Cir.1991).

Defendants contend that Hadad's action is barred by the doctrine of *res judicata.* On November 2, 1988 Judge White denied defendants' previous motions on this issue of *res judicata* (Docket No. 60). The defendant Village and Village Council request that this matter be re-opened in light of the recent Ohio Supreme Court decision in *Grava v. Parkman Twp.,* 73 Ohio St.3d 379, 653 N.E.2d 226 (1995). These defendants maintain that Judge White's November 2, 1988 memorandum order denied their motion for summary judgment on *res judicata* on the basis that the 2506 appeal and the present § 1983 claim were not the same "cause of action." Defendants point to the language in the opinion in *Grava* which holds that a valid

final judgment entered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action.

This argument is plainly incorrect. Despite the changes in the concept of judicial *res judicata* under Ohio law, *res judicata* pursuant to *Grava* still requires the final decision *on the merits. Norwood v. McDonald,* 142 Ohio St. 299, 52 N.E.2d 67, 27 Ohio Op. 240 (1943); *Whitehead v. General Telephone Co.,* 20 Ohio St.2d 108, 254 N.E.2d 10, 49 Ohio Op.2d 435 (1969); Sanders Confectionery Products Inc., v. Heller Financial, Inc., *973 F.2d 474, 480 (6th Cir.1992);* Ungrady v. Burns International Security Services, Inc., *767 F.Supp. 849, 851 (N.D.Ohio 1991).* "Under the doctrine of *res judicata,* a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action." *Parklane Hosiery v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552, 559 n. 5 (1979). *Since there was no final* judicial *termination* on the merits *as a result of the dismissal of the complaint brought under Ohio Rev.Code § 2506.01 without prejudice, there was no bar to subsequent litigation.*

 Moreover, an appeal under Ohio Rev.Code § 2506.01 is arguably not the only unutilized means in which Hadad could have sought redress for the alleged wrongs in the state court. Hadad as a police officer arguably also could appeal his discharge pursuant to Ohio Rev.Code § 124.34 (see *In re Locke,* 33 Ohio App.2d 177, 187, 62 Ohio Op.2d 276, 282, 294 N.E.2d 230 (1972)), this section bestows upon police and fire chiefs and members of municipal police and fire departments the ability for a *de novo* appeal in the court of common pleas. (formerly Ohio Rev.Code § 143.27). A third arguable alternative is that Hadad could have pursued a declaratory judgment action under Ohio Rev.Code Chapter 2721. See *Gannon v. Perk,* 47 Ohio App.2d 125, 133–35, 1 Ohio Op.3d 233, 238–

40, 352 N.E.2d 606 (1975). In fact, the issue of failure to exhaust state judicial remedies under Ohio Rev.Code § 124.34 was addressed by the Sixth Circuit in *Loudermill v. Cleveland Board of Education,* 721 F.2d 550 (6th Cir.1983), and not reviewed by the Supreme Court. The Sixth Circuit found that failure to appeal the adverse administrative decision for discharge of a public employee did not result in *res judicata. Loudermill,* 721 F.2d at 555. In short, in order to have *res judicata* due to a prior action in state courts, there must be a judgment on the merits. *Loudermill,* in effect, excused the plaintiff from exhausting state remedies prior to initiating a § 1983 action for alleged violations of procedural due process. *Id.,* 721 F.2d at 555; *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. at 537, 105 S.Ct. at 1490–91, 84 L.Ed.2d at 500–01.[2]

Defendant Police Chief Clark, though, raises a more serious argument requesting the court to revisit Judge White's holding based on *administrative res judicata.* In *University of Tennessee v. Elliott,* 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), the Supreme Court concluded that although 28 U.S.C. § 1738 does not apply to state administrative determinations that have not been subjected to state judicial scrutiny, nonetheless,

> we hold that when a state agency "acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate," federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts. (citations and footnotes omitted)

*Id.* at 799, 106 S.Ct. at 3226, 92 L.Ed.2d at 646–47.

 The pertinent question then becomes whether the Village Council was "acting in a judicial capacity." The Sixth Circuit in *Hadad v. Croucher,* Case No. 94–3476, 1995 WL 600814 determined that the Village Council was not acting in a judicial capacity, but only

---

2. There is a "Catch–22" here. Although a litigant is not required to exhaust state remedies, the litigant's access to meaningful state postdeprivation procedures may preclude claims of

procedural due process violation. *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Collyer v. Darling,* 98 F.3d 211, 223 (6th Cir.1996).

in an administrative capacity and therefore not entitled to judicial immunity. The issue appears to have been resolved.

However, since defendants continue to express doubts, it must be pointed out that the post-termination employment hearing was intended to be adjudicated impartially in order to qualify as action in a judicial capacity. See *Duchesne v. Williams,* 849 F.2d 1004, 1006, 1008 (6th Cir.1988); *Saavedra v. City of Albuquerque,* 73 F.3d 1525, 1530 (10th Cir.1996). Hadad has presented sufficient evidence to overcome the Village Council's contention that they were an impartial tribunal. Hadad alleges there was a conspiracy between the Village Council and Mayor Croucher and Police Chief Clark (Complaint ¶ 41). Hadad has shown that prior to the post-termination hearing involving Commander Perry, the Village Council met with municipal attorneys to discuss the proceedings. Further, by affidavit Hadad states that prior to his termination, he had heard a rumor of his impending discharge and he telephoned Council President Gymer to confirm the truth or falsity of this rumor. According to Hadad, Council President Gymer told him that he discussed the possible termination of some Village of Moreland Hills police officers with Mayor Croucher and he advised Mayor Croucher to find some documentation to support any such employment terminations. Council President Gymer refused, though, to inform Hadad whether he was about to be terminated (Hadad affidavit ¶ 44, 45).

In addition, Council President Gymer is on record in his deposition stating that Hadad's use of time to conduct the criminal investigation was improper, as follows:

A I think in the case of Norm Hadad there were specific—there was concerns about a specific incident that may not have gone to the issue of the overall management of the police department. I think, with respect to the other two, it was a question of the village having a necessity to be assured that its police department was being run efficiently for the benefit of the citizens, and that we didn't have a lot of police on the street pursuing their own agendas and becoming involved in a lot of distracting type of activities.

Q What do you mean by their own agendas? What was their own agendas?

A Whatever it is that they did with their time that was not in pursuit of village business.

Q Would you consider investigating crimes committed in the Village of Moreland Hills to be proper use of a police officer's time in Moreland Hills?

A Yes.

Q Would you consider investigation of alleged crimes committed by public officials in Moreland Hills to be proper use of a Moreland Hills Police Officer's time?

Did you hear the question, Mr. Gymer?

A Yeah, I'm thinking about it. *I would say no.* (emphasis supplied).

(Gymer Dep. 88–89).

Further, following the Village Council's decision upholding Hadad's employment termination by Mayor Croucher involving Hadad, the Village Council subsequently within a few days also upheld the Mayor's discharge of Officer Sedlack. Officer Sedlack was also involved in the criminal investigation of city officials and employees. Council President Gymer admitted that he made the decisions in both cases contemporaneously (Gymer Dep. at 55) and in responding to this dismissal of Officer Sedlack, Council President Gymer explained:

Q You did discipline Mr. Sedlack, isn't that correct, council voted to discipline; isn't that correct?

A Correct.

Q What did council find that Mr. Sedlack had done to warrant this?

A Engaged in activities which we did not believe were appropriate for a policeman in our police department to be engaging in.

Q And do those activities include his participation in the criminal proceedings against Charles Clark and Alvin Croucher?

A Yes.

Q And was that the reason why you decided he needed to be managed and learn how to respond to authority?

A Yes.

Q Because of his participation in the criminal proceedings?

A Yes.

(Gymer Dep. 60–61).

Based on this testimony and the circumstances in this case, Hadad has created a genuine issue of fact of possible prejudice or bias by the Village Council. The Council President clearly did not believe that the Village police officers had any business investigating corruption by municipal officials. Consequently, defendants have shown no basis upon which the court could reverse Judge White's prior decision and find administrative *res judicata* pursuant to *University of Tennessee v. Elliott, supra.* There was no "state agency acting in a judicial capacity", and the Sixth Circuit's finding that the Village Council was acting in an administrative capacity and not a judicial capacity remains valid. Since the complaint cannot be dismissed on the basis of *res judicata*, the court must now turn its attention to the arguments on the merits of Hadad's causes of action contained in the cross-motions for summary judgment.

*First Cause of Action:*

■ Hadad maintains in the first of his three causes of action that the defendants terminated his employment solely because of and in retaliation for his exercise of his right of free speech on important matters of public concern. This action allegedly was a deliberate and intentional violation of his constitutional rights guaranteed under the First and Fourteenth Amendments to the United States Constitution. Defendants dispute this claim.

Under Rule 56 of the Federal Rules of Civil Procedure granting a motion for summary judgment is only proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. In determining whether there is a genuine issue of material fact all inferences drawn from the underlying facts contained in affidavits, pleadings, responses to discovery requests, and depositions must

be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538, 552–53 (1986); *United States v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). A court must inquire "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 213–14 (1986). The court may not make credibility determinations or weigh the evidence when ruling on a motion for summary judgment. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14, 91 L.Ed.2d at 215. The burden is upon the movant to demonstrate the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142, 154 (1970); *Smith v. Hudson,* 600 F.2d 60, 63 (6th Cir. 1979), *cert. dismissed* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979). However, the nonmoving party is obliged to produce some evidence other than mere pleadings themselves to demonstrate that there is a genuine issue for trial. *Celotex Corporation v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274–75 (1986). The nonmoving party must produce significant probative evidence in support of the complaint to defeat the motion for summary judgment through affidavits or admissions on file. *Moore v. Philip Morris Companies, Inc.,* 8 F.3d 335, 339–40 (6th Cir.1993). In the final analysis, "the threshold inquiry ... [is] whether there is a need for trial—whether in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511, 91 L.Ed.2d at 212–13; *Moore,* 8 F.3d at 340.

■ Hadad's claim of First and Fourteenth Amendment violations due to discharge of a public employee in retaliation for exercise of the right of free speech has its roots in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In *Pickering* the Supreme Court

found that free speech on matters of public concern must be balanced against the public employer's right to have its employees perform their daily duties unimpeded or without interference in regular government operation. In regard to this balancing, the court specifically stated that, "... statements by public officials on matters of public concern must be accorded First Amendment protection despite the fact that the statements are directed at their nominal superiors." *Pickering*, 391 U.S. at 574, 88 S.Ct. at 1737, 20 L.Ed.2d at 820. However, the fact that the speech is directed toward a matter of public concern does not protect it in all circumstances. The court added that the free speech clause of the First Amendment protects a public employee's right to speak on issues of public importance and may not furnish the basis for dismissal from public employment in the absence of proof of false statements knowingly or recklessly made. *Id.* at 574, 88 S.Ct. at 1737–38, 20 L.Ed.2d at 821. The balancing test set out in *Pickering* continues to retain its vitality and has been more recently applied in *Board of County Comm., Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. ——, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996), which held that First Amendment Protections must also be accorded to an individual whose status with the government is as an independent contractor working in the public sector.

■■■ Public employees who speak on issues of public concern are protected from their employer's adverse employment actions when the employee's interest in speaking outweighs the government's interest in efficient operations. *Waters v. Churchill*, 511 U.S. 661, 667–69, 114 S.Ct. 1878, 1884, 128 L.Ed.2d 686, 695 (1994); *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708, 716–17 (1983). "It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315, 324 (1987); *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570, 577–78 (1972); *Williams v. Commonwealth of Ky.*, 24 F.3d 1526, 1534 (6th Cir.1994), *cert. denied* 513 U.S. 947, 115

S.Ct. 358, 130 L.Ed.2d 312 (1994). Of course this protection accorded to State employees also extends to employees of local government as *Pickering* itself illustrates. And see *Mt. Healthy City School Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Hickman v. Valley Local School Dist. Bd. of Ed.*, 619 F.2d 606 (6th Cir.1980); *McMurphy v. City of Flushing*, 802 F.2d 191(6th Cir.1986) (involving law enforcement officer); *Barnes v. McDowell*, 848 F.2d 725, 732–33 (6th Cir.1988), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989); *Brown v. City of Trenton*, 867 F.2d 318, 321 (6th Cir.1989). In order to prevail upon a claim of retaliation for the exercise of First Amendment protected speech, the public employee must first demonstrate the threshold element that the alleged retaliatory discharge was due to speech on a matter of public concern, and secondly the causation element that the exercise of free speech was the substantial or motivating factor behind the discharge. *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. at 287, 97 S.Ct. at 576, 50 L.Ed.2d at 483–84; *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689, 75 L.Ed.2d at 719–20; *Rankin*, 483 U.S. at 385, 107 S.Ct. at 2891, 97 L.Ed.2d at 324–25; *Barnes v. McDowell*, 848 F.2d at 732; *Matulin v. Village of Lodi*, 862 F.2d 609, 612–13 (6th Cir.1988). The court's task is to apply the *Connick* test to the facts. *Waters v. Churchill*, 511 U.S. at 667–71, 114 S.Ct. at 1884–85, 128 L.Ed.2d at 695; *Connick*, 461 U.S. at 148 n. 7 and 150 n. 10, 103 S.Ct. at 1691 n. 7 and 1692 n. 10, 75 L.Ed.2d at 720 n. 7 and 722 n. 10.

■■■ Turning now to the threshold inquiry, "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of the given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690–91, 75 L.Ed.2d at 720–21; *Matulin*, 862 F.2d at 612. There is no question that Hadad's communications concerning his investigation of Mayor Croucher and other Village employees to Commander Perry and the Cuyahoga County Prosecutor's Office involve matters of public concern. Likewise, Hadad's informing the TV8 "I–Team" about the Mayor's possible illegal water use

was a matter of public concern. Speech disclosing public corruption or improper operation of public organization or government is a matter of public concern. *Marohnic v. Walker,* 800 F.2d 613, 616 (6th Cir.1986); *McMurphy v. City of Flushing,* 802 F.2d at 196; *Solomon v. Royal Oak Twp.* 842 F.2d 862, 865 (6th Cir.1988). Defendants do not challenge Hadad's contention that his speech addressed matters of public concern.

■■■■ Turning now to the issue of causation, the public employee must demonstrate facts to show that the First Amendment protected speech was a substantial or motivating factor in the adverse employment activities. *Langford v. Lane,* 921 F.2d 677, 683 (6th Cir.1991); *Matulin,* 862 F.2d at 613. "The burden then shifts to the employer, who must be given an opportunity to prove that the plaintiff would have been fired even if he had not engaged in protective conduct." *Langford,* 921 F.2d at 683; *Matulin,* 862 F.2d at 613; *Barnes,* 848 F.2d at 733 n. 9. Simply because a public employee has satisfied the threshold inquiry of engaging in protected speech, that in itself is no basis for elevating the employee's position to preclude the consequences of insubordination or malfeasance.

> A rule of causation which focuses solely on whether protected conduct played a part, "substantial" or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing ... A borderline or marginal candidate ... ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

*Mt. Healthy,* 429 U.S. at 285–86, 97 S.Ct. at 575–76, 50 L.Ed.2d at 482–83; *Langford,* 921 F.2d at 683.

■■■■ Generally, causation is an issue which must be decided by the jury. *Matulin,* 862 F.2d at 613; *Hartsel v. Keys,* 87 F.3d 795, 803 (6th Cir.1996), *cert. denied* —— U.S. ——, 117 S.Ct. 683, 136 L.Ed.2d 608 (1997). However, the court may grant summary judgment in causation inquiry where it is warranted. *Hartsel,* 87 F.3d at 803; *Langford,* 921 F.2d at 683. In causation inquiry, plaintiff may satisfy his initial burden by circumstantial evidence. *Hartsel,* 87 F.3d at 803; *Langford,* 921 F.2d at 683. This includes the sequence of events. *Matulin,* 862 F.2d at 613.

■■■■ Hadad has shown sufficient evidence of causation to link defendants' adverse employment actions to his involvement in the criminal investigation and disclosure of his findings to the prosecutor's office and television media. Contemporaneous with his discharge, Officer Robert Sedlack was also discharged and his discharge affirmed by the Village Council. Officer Sedlack was discharged explicitly for his participation in the criminal investigation. Also Hadad has shown indications of a close relationship between the Village Council and Mayor Croucher, and evidence of the Council President's unfavorable views on Village employed police officers conducting criminal investigations of Village officials. Hadad has presented genuine issues of disputed material fact of retaliation for the exercise of First Amendment protected speech being the motivating or substantial factor behind the discharge. *Collyer v. Darling,* 98 F.3d 211, 228 n. 18 (6th Cir.1996); *McLaurin v. Morton,* 48 F.3d 944, 947 (6th Cir.1995).

■■■■ However, this showing by Hadad alone is insufficient because the defendants may rebut this by showing that they would have made the same decision assuming Hadad had not engaged in the protected conduct. Defendants' rebuttal is tied in this situation to their qualified immunity defense. The sequence of events in the progression of Hadad's termination proceedings supports the qualified immunity defense of the Chief of Police, Mayor and individual Village Council members. The Village itself, of course, cannot utilize this defense. *Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164–66, 113 S.Ct. 1160, 1161–62, 122 L.Ed.2d 517, 523 (1993); *Owen v. City of Independence,* 445

U.S. 622, 650, 100 S.Ct. 1398, 1415, 63 L.Ed.2d 673, 692–93 (1980). The question of qualified immunity is a question of law. *Walton v. City of Southfield*, 995 F.2d 1331, 1335 (6th Cir.1993); *Williams v. Commonwealth of Ky.*, 24 F.3d at 1532. Qualified or good faith immunity is not a simple defense and multiple factors must be considered in reaching this legal conclusion:

> Government officials, such as the individual defendants in this case, have qualified immunity from personal liability for actions taken while performing discretionary functions. These officials "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410 (1982). If the right the government official allegedly violated was clearly established at the time of the challenged conduct, "the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818–19, 102 S.Ct. at 2738–39, 73 L.Ed.2d at 410–11.

For a right to be clearly established,

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523, 530–31 (1987) (citations omitted). "[T]he particular conduct of the official must fall clearly within the area protected by the constitutional right, such that a reasonable official would have known that his or her conduct violated the constitutional right." *Walton*, 995 F.2d at 1336.

"In inquiring whether a constitutional right is clearly established, we must 'look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.'" *Id.* (quoting *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir.1991)), *cert. denied*, 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992).

> [I]n the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself. In an extraordinary case, it may be possible for the decisions of other courts to clearly establish a principle of law. For the decisions of other courts to provide such "clearly established law," these decisions must both point unmistakenly to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.

*Ohio Civil Serv. Employees Ass'n v. Seiter*, 858 F.2d 1171, 1177 (6th Cir.1988).

*Williams*, 24 F.3d at 1532–33.

Hadad bears the burden to convince the court that the law was clearly established at the time of the allegedly offensive conduct of the defendants. *Daugherty v. Campbell*, 935 F.2d at 783; *Hughes v. City of North Olmsted*, 93 F.3d 238, 241 (6th Cir.1996). The alleged unlawfulness must be "apparent" in light of the law and at the pertinent point in time. *Hughes*, 93 F.3d at 241; *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039, 97 L.Ed.2d at 530–31.

The Supreme Court in *Pickering* declined to extend protection to false statements that are knowingly or recklessly made. *Id.*, 391 U.S. at 574, 88 S.Ct. at 1737, 20 L.Ed.2d at 820–21. Hadad has not overcome the evidence that the individual defendants would have had a reasonable belief that his calling the news media and participation in the criminal investigation constituted statements recklessly made at the time when termination procedures were commenced in April 1986. As discussed in *Barnes v. McDowell*, an employee's allegations of public corruption alone are not sufficient to withstand summary judgment on the employer's claim that

the allegations were not genuine. And see *Dambrot v. Central Michigan Univ.,* 55 F.3d 1177, 1186–87 n. 8 (6th Cir.1995).

Yet while a simple allegation that a public employee's speech disclosed corruption in a public agency satisfies the pleading requirements of the Federal Rules of Civil Procedure, those same rules require that when a defendant has moved for summary judgment, *a plaintiff must present concrete evidence to support the allegation in order to survive the motion.* the evidence need not be conclusive on the issues presented in the litigation, but it must sufficiently indicate the existence of facts which are disputed by the parties and which are material to the litigation to defeat the defendant's motion. (emphasis added).

*Barnes,* 848 F.2d at 734. "If an official reasonably believes that an employee made statements with knowledge of, or reckless indifference to, their falsity, the official would conclude that the employee could be fired without offending the First Amendment. Qualified immunity would therefore attach." *Gossman v. Allen,* 950 F.2d 338, 342 (6th Cir.1991); *Williams v. Commonwealth of Ky.,* 24 F.3d at 1535–36.

Mayor Croucher in his motion for summary judgment claims that Hadad's statements were false. Hadad has not shown the basis for his statements concerning public corruption by Mayor Croucher other than that they were based on conversations with Ms. Washington and that he could not locate the bookkeeping entries with respect to sales of scrap metal. The evidence that Hadad's statements were false is overwhelming in this case in light of the evidence that Police Chief Clark and Mayor Croucher were criminally prosecuted and both were acquitted. The sequence of events fully supports the individual defendants' claims of qualified immunity. Police Chief Clark recommended discharge of Hadad from the employ of the village after he had been acquitted of public corruption charges in March 1986. Likewise, Mayor Croucher initiated suspension and discharge proceedings following his acquittal in April 1986. At the time the Village Council reviewed Mayor Croucher's discharge of Hadad, Hadad's statements were reasonably

perceived to have been false and recklessly made. There is no evidence in this record to show that Hadad's collaboration with Commander Perry was for the purpose of fabricating knowingly false evidence.

This is further buttressed by Hadad's presentation of evidence at the administrative hearing itself before the Village Council in June 1986. Hadad did not take issue with the fact that both public officials had been acquitted. Rather his focus was upon both exculpating himself because he claimed he had not received prior warnings informing him about misuse of the LEADS computer network, or that his debt collection activities were improper. Hadad also claimed some grounds were untrue. Consequently, individual members of the Village Council, Mayor Croucher and Police Chief Clark had reasonable basis for their perception that Hadad's statements against them were false and recklessly made.

The pertinent case law at that point in time also supports reliance on *Pickering.* After Hadad's discharge, the Sixth Circuit decided *McMurphy v. City of Flushing,* which addressed a similar situation involving a police officer who was found to have made accusations of public corruption out-of-spite. *Id.,* 802 F.2d at 195. The district court's decision under review which was contemporaneous with Hadad's dismissal held that the police officer's investigation was unauthorized, contrary to regulation and the statements were not constructive. The district court focused on the untruthful nature of the police officer's statements because the officer's accusations were investigated independently and considered unfounded. The district court's decision aligns with Hadad's situation and supports a reasonable belief that the conduct was unprotected. The Sixth Circuit, though, on review did not focus on the falsity of statements but instead focused on the *Pickering* balancing test of the destructive nature of the police officer's comments balanced against the need for efficient operations in a small municipal police force. Another contemporaneous judicial decision is the district court's decision in *Solomon v. Royal Oak Twp.,* 656 F.Supp. 1254 (E.D.Mich.), *aff'd in part and rev. in*

*part,* 842 F.2d 862 (6th Cir.1988) which involved a discharged police officer, who had complained publicly to a newspaper about his superior officer's improper activities, but who did not falsely accuse his superior officer of wrongdoing. *Id.* at 1263 In light of the fact that Hadad's and Commander Perry's criminal accusations were presented for criminal trial in the state court and Mayor Croucher and Police Chief Clark were acquitted, the individual defendants had a reasonable basis to perceive Hadad's statements as false and recklessly made.

■ *Gossman v. Allen,* and *Williams v. Commonwealth of Ky.* illustrate the general approach to analysis of knowingly or recklessly false speech under the defense of qualified immunity, rather than under the threshold issue whether the speech is protected as a matter of public concern. *Pickering* is clear that a knowingly or recklessly false statement is not a matter of public concern. Defendants in this action have not carried their burden to establish that Hadad's speech was *in fact* (as opposed to in perception) a "false statement knowingly or recklessly made by him." *Pickering,* 391 U.S. at 574, 88 S.Ct. at 1738, 20 L.Ed.2d at 820–21. Although Mayor Croucher and Police Chief Clark were acquitted, the investigation was apparently sufficiently convincing to cause the prosecutor to present the matter to the grand jury. Consequently, even though Hadad's statements have been shown to be false for purposes of summary judgment, they have not been shown to have been made knowingly or recklessly. Therefore, the speech arguably retained its First Amendment protection.

■ Although the individual defendants in this case are protected by qualified or good faith immunity, that does not end the litigation on Hadad's first cause of action. In this complaint Hadad claims he is entitled to injunctive relief on his first cause of action to order defendants to reinstate and/or rehire him to his rightful employment position without loss of seniority and with all accrued employment benefits. Qualified or good faith immunity only precludes monetary damages against officials in their individual capacities and when there are claims for injunctive or declaratory relief, the district court must address these claims on their merits. *Collyer v. Darling,* 98 F.3d 211, 228 n. 18 (6th Cir. 1996); *Cagle v. Gilley,* 957 F.2d 1347 (6th Cir.1992). Since Hadad has made claim for injunctive relief, and has asserted a genuine issue of material fact with regard to his first cause of action, the court must schedule a trial on the issue whether Hadad is entitled to injunctive relief in the form of reinstatement following adverse employment action by the defendants in retaliation for his exercise of First Amendment protected speech. Defendants pursuant to *Pickering* will bear the burden of proof that Hadad's speech was recklessly false, or in the alternative that they would have discharged Hadad in any event by clear and convincing evidence. See *Langford,* 921 F.2d at 683; *Matulin,* 862 F.2d at 613. Hadad, on the other hand bears the burden of establishing that his discharge was motivated by his speech or that his speech played a substantial part in his termination from employment. The appearance of stale grounds for discharge regarding conduct occurring in 1984, and evidence of disparate treatment of members of the police department in disciplinary matters will be clearly relevant to Hadad's claim that the grounds for his termination were pretextual potentially entitling Hadad to reinstatement by federal court order.

Moreover, since qualified immunity also is limited in application to individual defendants in civil rights actions, the Village of Moreland Hills itself is not protected by this defense. In ¶ 11 of the complaint Hadad states that the individual council members "were members of the council of defendant Village of Moreland Hills and in such capacity exercised the *ultimate* power to establish municipal policies and supervise suspension, demotion and discharge of police officers by defendant Alvin T. Croucher" (emphasis supplied).

■ There is no *respondeat superior* liability for a municipality simply due to the fact that it had hired tort feasors as its agents. A municipality may be held liable under § 1983 only for official policies or customs. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 128, 108 S.Ct. 915, 926, 99 L.Ed.2d

107, 120–21 (1988); *Pembaur v. Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452, 463–64 (1986); *Hull v. Cuyahoga Valley Joint Voc. School Dist.*, 926 F.2d 505, 515 (6th Cir.1991), *cert. denied* 501 U.S. 1261, 111 S.Ct. 2917, 115 L.Ed.2d 1080 (1991). In *Hull* the court explained that "final policy maker" is defined very narrowly as illustrated in *Pembaur* which stated that even though a sheriff may have discretion to hire and fire employees, he may nonetheless not be the official responsible for establishing employment policy, or that he is the one with "final authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 481, 106 S.Ct. at 1299, 89 L.Ed.2d at 464. And that further

> [O]nly those municipal officials who have 'final policy making authority' may by their actions subject the government to § 1983 liability.'

*Praprotnik*, 485 U.S. at 123, 108 S.Ct. at 924, 99 L.Ed.2d at 117–18; *Hull*, 926 F.2d at 515.

Hadad has submitted genuine issues of material fact with respect to the liability of the Village of Moreland Hills itself. The allegations in the complaint have constrained Hadad to show that the Village Council is the "final policy maker" of the Village of Moreland Hills. Hadad's evidence arguably demonstrates his position that the Village Council members knew that several of its police officers including Commander Perry and Hadad were involved in the criminal investigation of Mayor Croucher and Police Chief Clark, that the Village Council affirmed Mayor Croucher's decision to terminate employment of those officers with the Village, and that there was arguable bias in the "ultimate" municipal decision maker against those police officers due to a possible policy to retaliate against the "inappropriate activity" of investigating corruption by Village officials. Therefore, the Village of Moreland Hills must remain in this action as a party and subject to potential monetary liability due to genuine issue of material fact whether the Village was motivated by a policy of retaliation against Hadad and other police officers involved in the investigation of municipal corruption.

*Second Cause of Action:*

■ In his second cause of action Hadad claims the actions of the defendants were deliberate and intentional violations of § 1983 and his constitutional right to procedural and substantive due process as guaranteed by the Fourteenth Amendment to the United States Constitution. In support of his allegations concerning substantive due process, Hadad relies upon the trilogy of cases *Gutzwiller v. Fenik*, 860 F.2d 1317 (6th Cir.1988); *Yashon v. Hunt*, 825 F.2d 1016 (6th Cir.1987), *cert. denied* 486 U.S. 1032, 108 S.Ct. 2015, 100 L.Ed.2d 602 (1988), and *Nishiyama v. Dickson County, Tenn.*, 814 F.2d 277 (6th Cir.1987). Hadad argues that the substantive due process under the Fourteenth Amendment prohibits any action by a government official which is arbitrary or capricious. "Substantive due process . . . protects specific fundamental rights of individual freedom and liberty from deprivation at the hands of arbitrary and capricious government action." *Gutzwiller*, 860 F.2d at 1328. Hadad cites *Gutzwiller* as an illustration in which the plaintiff suffered a denial of tenure which was arbitrary as evidenced by its substantial departure from accepted academic norms. Similarly in *Yashon v. Hunt*, the reinstatement of a surgeon to the hospital's medical staff was at issue. The Sixth Circuit in *Yashon* explained that the hospital's decision to deny staff privileges must be untainted by irrelevant considerations and supported by substantial evidence in order to be free from arbitrariness, capriciousness or unreasonableness. *Yashon*, 825 F.2d at 1027. Finally, in *Nishiyama*, Hadad relies upon the discussion of arbitrary government action evidenced by a reckless indifference in permitting an inmate to have unsupervised use of a patrol car. This was conduct that was obviously "outrageous."

Hadad's claim of denial of substantive due process must fail. Granted the Sixth Circuit has, "recognized that the Fourteenth Amendment has a substantive due process component that 'protects specific fundamental rights of individual freedom and liberty' from deprivation at the hands of arbitrary and capricious government action." *Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1350

(6th Cir.1992), quoting *Gutzwiller*, 860 F.2d at 1328. Nevertheless, as explained in *Sutton*:

> State-created rights such as [plaintiff's] contractual right to promotion do not rise to the level of 'fundamental' interest protected by substantive due process. Routine state-created contractual rights are not ... so vital that 'neither liberty nor justice would exist if [they] were sacrificed.'

*Charles v. Baesler*, 910 F.2d 1349, 1353 (6th Cir.1990) (citations omitted).

> Although *Baesler* did not conclude that all state-created contract rights lack substantive due process protection, and specifically left unanswered the question whether substantive due process may protect a contract right to keep a tenured job, *id.* at 1355 (citing *Ramsey v. Board of Education of Whitley County*, 844 F.2d at 1274–75 (C.A.6 Ky.1988) and *Harrah Indep. Sch. Dist. v. Martin*, 440 U.S. 194, 197–98, 99 S.Ct. 1062, 1063–64, 59 L.Ed.2d 248 [253–54] (1979)), we are persuaded by the reasoning of *Baesler* that *plaintiff's statutory right to be discharged only for cause is not a fundamental interest* protected by due process.

*Id.*, 958 F.2d at 1351.

Although Hadad's employment was protected merely by the requirement of discharge for "just cause", *Sutton* does recognize that a situation may exist where there is arbitrary or capricious action in termination of public employment. *Id.*, at 1351. At this point it becomes necessary to scrutinize the grounds advanced by Mayor Croucher which allegedly constituted "just cause" for Hadad's termination and the findings of fact of the Village Council. Hadad contends that the defendants were limited in their discretion to terminate him only for violation of the rules and regulations governing the police department. However, Article IV, § 5 of the Village Charter clearly provides that the Mayor "shall have the power to discipline, suspend ... and/or discharge from employment any officer or employee ... for incompetence, gross neglect of duty, gross immorality, habitual drunkenness, failure to obey orders given them by the proper authority, or for any other reasonable or just cause." Pursuant to the Village Charter, Hadad's employment was protected to the extent he could only be discharged for "just cause." There was no provision which limited the Mayor's discretion to violation of the rules and regulations of the Village Police Department. Moreover, the Village Council found reasonable and just cause for Hadad's dismissal from employment.

Related to this argument, Hadad also points out that pursuant to § 4.504 of the Police Department rules governing suspension, dismissal and resignation, that the Chief of Police was required to "immediately bring charges against any officer for violating any of the rules and regulations." Obviously the Chief of Police did not act immediately. Nonetheless, in line with the evidence that Mayor Croucher had authority to discharge Hadad for "just cause", Police Chief Clark's delay in recommending Hadad's termination did not rise to the level of being arbitrary and capricious.

Hadad next contends due process was violated due to the pretextual nature of the charges. This contention is clearly rebutted by the evidence before the Village Council. The first three of the Mayor's grounds concerned improper use of the LEADS computer terminal for other than legitimate criminal justice purposes. Hadad took the position that he did not know that his uses were improper. However, Police Chief Clark testified that the proper use of the LEADS terminal was part of a police officer's basic instruction at the time they first become a police officer and that it was continuing indoctrination through the time in service (Village Council Hrg. TR. 22). More importantly, Hadad's own witness at the hearing, Chagrin Falls Police Chief Lester LaGatta testified that LEADS use training was part of a communications class that is required by the Ohio Peace Officers Training Council (Village Council Hrg. TR. 287). Thus, although Hadad denied knowledge as to what constituted a proper or improper use of the LEADS terminal, the Village Council clearly had substantial evidence to find that Hadad did know.

Turning now to specific allegations in the LEADS-use related grounds, the first ground involved obtaining traffic violation history of Councilman Charles S. Mellen. There was no traffic citation issued against Mr. Mellen and therefore at first blush this appeared to be an improper use. However, Hadad explained to the Village Council that there was an unknown vehicle left at the Village Hall parking lot and therefore he ordered the check for security purposes and did not review the councilman's traffic history but rather sought to identify whose vehicle was present. The Village Council accepted this explanation by deleting this ground from the reasons for discharge in its findings of fact.

■ The second reason for discharge advanced by the Mayor was that Hadad improperly requested and obtaining data from the LEADS computer terminal on September 17, 1987 concerning the criminal history of Antonia Hadad which was not related to a legitimate criminal justice purpose. Hadad explains in his affidavit that he used the LEADS computer to request criminal history of his wife, Antonia, because he was in the process of applying to the Chagrin Falls Police Department for employment and he understood that this information was required with his application for employment (Affidavit ¶ 78, 80). Hadad also focuses on the fact that the request form for LEADS computer information contains two boxes, one to be marked for "employment" and the other to be marked for "criminal" (Village Council Hrg., Mayor's Exhibit 5). Hadad did mark the request for Antonia as employment related. However, Police Chief LaGatta from the Chagrin Falls Police Department testified at Hadad's post-termination hearing before Council that Hadad had submitted an application for employment but further stated that although Chagrin Falls does make a pre-employment check on the applicant's spouse, using LEADS for pre-employment check is a valid purpose only for the agency doing the employment-related investigation (Village Council Hrg. TR. 283–84). Therefore, in light of the evidence that Hadad would have been trained on the proper use of the LEADS computer and the testimony from his own witness, the Village Council had

substantial evidence on which to find Hadad's use to obtain the criminal history of his wife to have been improper.

The third ground advanced by Mayor Croucher is that Hadad improperly obtained LEADS computer data concerning the traffic violation history of Francisco DiBlasi which was not related to a legitimate criminal justice purpose. In his affidavit Hadad denies requesting the information and states that on January 6, 1986 Mr. DiBlasi was involved in an automobile accident in Bainbridge and it would have been standard procedure for the Bainbridge police officer investigating the accident to use the LEADS computer for the traffic violation history of Mr. DiBlasi, and that Bainbridge and Moreland Hills shared access to the same LEADS computer terminal located in Chagrin Falls. (Hadad Affidavit ¶ 76–78).

■ The evidence presented to the Village Council, however, consisted of the testimony from Dispatcher Genevieve Jackson who testified that she worked at the Chagrin Falls Police Department and that she had run this LEADS computer printout on Hadad's oral request on January 6, 1996 (Village Council Hrg. TR. 156–63). She wrote Hadad's name on the printout and placed it in the Moreland Hills tray for pickup. The dispatcher also testified that she had known Hadad as long as he had been with the Moreland Hills Police Department and that she was aware that Hadad had a relative by the name of DiBlasi. Moreover, the court cannot overlook the fact that Dispatcher Jackson was not made a defendant in this action as being part of the alleged conspiracy involving the Chief of Police, the Mayor and the Village Council. Both the Mayor and the Village Council certainly had substantial evidence to support the position that Hadad had knowingly made improper uses of the LEADS computer.

The fourth, fifth, sixth and seventh reasons for discharge advanced by the Mayor revolved around Hadad's debt collection activities. Hadad was discharged for collecting delinquent accounts during 1984 and 1985 without receiving prior approval from the proper Village officials as required by the

rules and regulations of the police department, misuse and abuse of his position in furtherance of debt-collection activity and performance of services related to those activities while on duty during 1984 and 1985, and unauthorized practice of law. The evidence produced at the hearing showed that the rules and regulations concerning outside employment were distributed on September 27, 1985 with specific reference to Regulation 4.605 concerning outside employment which stated that no officer shall engage in outside employment without prior permission being granted and that failure to comply may subject an officer to disciplinary action (Mayor's Exhibit 20).

On October 25, 1985 Hadad requested permission for the police chief with reference to the September 27, 1985 directive about his part time collection business (Mayor's Exhibit 16). Police Chief Clark testified that Hadad's request was presented to Mayor Croucher and the Law Department for evaluation, but Hadad was not granted permission (Hrg.45–47). Hadad admitted that he had been informed on December 13, 1995 that his request was denied (Hrg.239).

The evidence also showed that while awaiting permission on October 17, 1995 Hadad did sign and file an affidavit for garnishment in a collection matter before the Bedford Municipal Court at the same time he was in Bedford on police-related matters. (Mayor's Exhibit 18H). Hadad's own witness, Police Chief LaGatta, testified that debt collection was incompatible with the position of a police officer. Moreover, Robert Talbert testified before the Village Council that in 1984 he was contacted several times by Hadad about a debt he owed to Peter DiBlasi's Men's Store and that when he met with Hadad, Hadad showed him his badge, said that he was an officer of the Moreland Hills Police Department and that he did collection work for several stores in the Chagrin Falls area (Hrg.120–22). Mr. Talbert dropped off his payments at the Moreland Hills Police Station and Hadad had given him phone numbers to contact him both at the police station and at home (Hrg. TR. 123).

Lawrence Czerr, Jr. testified that Hadad also collected debts Czerr owed to Peter DiBlasi's Men's Store (Hrg. TR. 140–41). He said he arrived home one night to find a card on the door from the Police Department of Moreland Hills with a note saying to call immediately. Czerr stated that he became distraught when he found the business card because he believed that there was an emergency situation. He called the Police Department and talked with Hadad who informed him that he was collecting a bill.

■ Based on the foregoing evidence, it was certainly reasonable for both the Mayor and the Village Council to find that Hadad had abused his position and should reasonably have known that the Village Police Department was incompatible with debt collection. Moreover, the evidence presented showed that Hadad was engaged in the unauthorized practice of law by signing court papers for an incorporated entity when he was not a licensed practicing attorney. Finally, the evidence showed that Hadad disregarded proper procedure when he did know of a specific rule requiring permission but he nonetheless continued his debt collection business without authorization.

The ninth reason advanced by the Mayor concerned Hadad's decision to cash and retain the proceeds from witness fees paid for testifying at a civil trial, when Hadad had also requested and received compensatory time from the Village for testifying at that trial. The check at issue was for the amount of $9.20 (Mayor's Exhibit 24). The Mayor contended that this check should have been endorsed and turned over to the Village. Police Chief Clark testified that the procedure in Moreland Hills Police Department concerning witness fees is that the officer has a choice of either collecting the witness fee or collecting compensatory overtime (Hrg. TR 59). The evidence presented to the Village Council showed at the time the check was cashed in February 1986 Hadad had received the Police Department Rules and Regulations. He had received these on October 1, 1985 and Police Chief Clark testified these rules provide that an officer is not permitted to obtain anything of value in the performance of his duty other than his salary (Hrg. TR. 67). Police Chief Clark did not provide a copy of the regulation for the Village Coun-

cil, but Hadad has attached a copy of it to the complaint and included it in his brief. This regulation reads:

3.012 *Conduct—Soliciting Gifts or Gratuities.* No officer shall solicit or accept at any time any personal gift, gratuity, special favor, or anything of value, including meals for performing his duty.

The exact wording of this regulation is consistent with Police Chief Clark's testimony at the post-termination hearing. Hadad testified that it was a custom of Village police officers to retain the witness fees, but he did not present any testimony other than his own to support this assertion. Based on Police Chief Clark's testimony, the Council had substantial evidence to find that Hadad had at least violated a known policy, if not the regulation against receiving anything of value other than salary in the performance of duty.

The record shows conclusively that both Mayor Croucher and the Village Council had substantial evidence to support their findings to discharge Hadad and further that the Village Council had substantial evidence to delete the Mayor's first ground in light of Hadad's explanation. Neither Mayor Croucher nor the Village Council acted arbitrarily and capriciously in their decisions to discharge Hadad from public employment or in sustaining the discharge on review.

Further, the numerous reasons advanced by Police Chief Clark in his April 5, 1986 letter were essentially the same as those advanced in the eight grounds for discharge by Mayor Croucher. The Chief of Police added an attendance factor which Mayor Croucher did not utilize. In the April 5, 1986 letter Police Chief Clark criticized Hadad because despite receiving a September 4, 1985 warning letter about being absent from duty, Hadad continued to present attendance problems in the latter part of 1985 and during 1986. Hadad has not presented any evidence to show that this additional allegation from the Chief of Police was not true, and therefore arbitrary or capricious.

■ The third case cited by Hadad, *Nishiyama,* implicitly raises the second aspect of substantive due process—that of outrageous behavior. Substantive due process claims are of two types. The first type is

assertion of a denial of a right, privilege, or immunity secured by the Constitution or federal statute other than mere procedural claims under the Fourteenth Amendment. *Parratt,* 451 U.S. at 536, 101 S.Ct. at 1913, 68 L.Ed.2d 420, 429; *Parate v. Isibor,* 868 F.2d 821, 831 (6th Cir.1989); *Mertik v. Blalock,* 983 F.2d 1353, 1367 (6th Cir.1993). Hadad's unsupported claim of arbitrary and capricious termination of public employment is the first type.

The second type of substantive due process is directed at official acts which may not occur regardless of the procedural safeguards accompanying them. These are acts which "shock the conscience" of the court. *McMaster v. Cabinet for Human Resources,* 824 F.2d 518, 522 (6th Cir.1987); *Mertik,* 983 F.2d at 1367–68. Hadad's discharge for the reasons advanced by Mayor Croucher and Police Chief Clark and the subsequent affirmance by the Village Council do not "shock the conscience" as being outrageous behavior. Based on this record and arguments advanced by Hadad, the court finds that summary judgment must be entered on Hadad's claims of violation of substantive due process.

■ However, the focus of Hadad's arguments as evidenced by his briefs is on the allegations of violations of *procedural* due process in the pre-termination hearing before Mayor Croucher. Hadad maintains that procedural due process right to an impartial and unbiased decision maker was violated when Mayor Croucher conducted his pre-termination hearing. In *Duchesne v. Williams,* 849 F.2d 1004 (6th Cir.1988), *cert. denied,* 489 U.S. 1081, 109 S.Ct. 1535, 103 L.Ed.2d 840 (1989), the due process effect of bias on the pre-termination hearing was examined. The Sixth Circuit found that the " 'just cause' requirement for discharge, does not entitle the employee to an impartial judge at the pre-termination 'right-of-reply' hearing. The right to respond before the official responsible for the discharge is sufficient." *Duchesne,* 849 F.2d at 1006. This is because the pre-termination hearing is, "an initial check against mistake in decision—essentially, a determination of whether there are rea-

sonable grounds to believe that the charges against the employee are true and support the proposed action." *Duchesne*, 849 F.2d at 1007, quoting *Loudermill*, 470 U.S. at 545–46, 105 S.Ct. at 1495, 84 L.Ed.2d 494, 505–07. *Duchesne* envisioned that a partial post-termination hearing would follow to correct and lend itself to the employee's ability to prove wrongful conduct by the employer.

Hadad counters *Duchesne* pointing out that it was distinguished in *Bettio v. Village of Northfield*, 775 F.Supp. 1545 (N.D.Ohio 1991), in which it was alleged that the village officials knowingly brought false charges in retaliation to the police officer's exercise of First Amendment protected speech. In such a situation, "the balance behind the court's reasoning in *Duchesne* regarding the minimal effect of bias on the adequacy of the pre-termination hearing weighs wholly in favor of the employee." *Bettio*, 775 F.Supp. at 1564. Consequently, "a terminated public employee has the right to a pre-termination hearing which is presided over by officials who have not brought false charges knowingly against the employee and whose bias would deprive the hearing of any and all meaningfulness." *Id.*

*Bettio's* exception, though, has no application in this case. The record establishes that the reasons provided by Mayor Croucher based upon the letter from Police Chief Clark have factual support. Hadad has not established that these grounds for discharge were knowingly false.

More to the point is Hadad's reliance on *Newsome v. Batavia Local School Dist.*, 842 F.2d 920 (6th Cir.1988), which discusses the procedural due process in student pre-expulsion hearings. In that case the court noted that if Newsome had shown that the principal and/or school superintendents had possessed a pre-existing animosity toward him, then they would not have been able to act as decision makers at the pre-expulsion hearing. *Newsome*, 842 F.2d at 926–27 and 927 n. 5. ▮▮▮▮▮▮▮ Mayor Croucher disputes when he first learned of Hadad's participation in the criminal investigation of him, there is no question that by May of 1986 the Mayor was well-aware of Hadad's involvement in the investigation leading to the May-

or's indictment and he was aware of this at the time he conducted the pre-termination hearing and acted as the decision maker. Hadad's argument that the Mayor had pre-existing animosity is certainly reasonable. Hadad, however, fails to carry his burden to overcome qualified or good faith immunity. The cases on which Hadad relies were decided subsequent to his termination. The Sixth Circuit decision in *Newsome* in 1988 followed the district court's dismissal of Newsome's claims on their merits in 1986. See *Newsome v. Batavia Local School Dist.*, 656 F.Supp. 147 (S.D.Ohio 1986). Consequently, even though Mayor Croucher may have had a pre-existing animosity when he acted as a decision maker at the pre-termination hearing in 1986, he was protected by qualified immunity. Hadad has not shown that Mayor Croucher's dual participation as the official who terminated Hadad and as the decision maker at the pre-termination hearing was clearly established as offensive to procedural due process in 1986.

▮▮▮▮ This leads to Hadad's next argument that the individual members of the Village Council and the Village itself violated due process on account of their bias, because they had actual knowledge of Mayor Croucher's bias in his role as the municipal decision maker but nonetheless ratified Mayor Croucher's conduct. The same qualified immunity protects the individual Village Council members. In 1986 there was no clearly established impartiality requirement which would have arguably mandated that the Village Council order a departure from the normal Village employee discharge procedures.

As explained in *Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), a plaintiff must show that the municipality actually had a policy of not taking reasonable steps to avoid constitutional violation. Hadad has not shown that there was such municipal policy. Consequently, judgment must also be entered for the Village on this point.

▮▮▮▮ This then leaves the question whether Hadad is entitled to injunctive relief despite the protection from qualified immunity conferred upon Mayor Croucher and the individual village council members. *See Col-*

lyer v. Darling, 98 F.3d at 228, n. 18. Notwithstanding the court's previous finding that Hadad is arguably entitled to injunctive relief for retaliation against the exercise of First Amendment protected speech, the court finds that Hadad under these circumstances is not arguably entitled to injunctive relief on his denial of procedural due process claim. Although the Mayor may have been biased against him at the pre-termination hearing, the Village Council did have substantial evidence to uphold the Mayor's grounds based upon the evidence that they heard at the administrative post-termination hearing. The post-termination was a full and fair hearing at which Hadad was able to present his argument challenging the correctness of Mayor Croucher's decision. Since Hadad was given the full opportunity to correct the pre-existing animosity that existed at the pre-termination hearing, he is not now entitled to reinstatement on that basis.

■ Hadad's next series of arguments on procedural due process are focused on violations of *Loudermill*, in which he claims he was informed only of the charges against him and was not informed of the evidence on which Mayor Croucher and the Village based these charges. Pursuant to *Loudermill*, a pre-termination hearing generally requires oral or written notice of the charges, an explanation of the employer's evidence, and the opportunity to present the employee's side of the story. *Loudermill*, 470 U.S. at 546, 105 S.Ct. at 1495, 84 L.Ed.2d at 506–07; *Buckner v. City of Highland Park*, 901 F.2d 491, 495 (6th Cir.1990); *Collyer v. Darling*, 98 F.3d at 224. Hadad points out that the evidence supporting the charges was stated in Police Chief Clark's April 5, 1986 letter to Mayor Croucher and that this letter was known to the Mayor and the Village at the time of his pre-termination hearing.

The Village Council counters that when an offer was made at the pre-termination hearing to explain the charges against him, Hadad merely requested the identity of the two witnesses he had allegedly harassed as part of his debt collecting business. This statement, however, does not precisely fit with the events contained in the hearing transcript from the pre-termination hearing. There was no offer to produce the evidence upon which the charges were based. Hadad asked for the reasons behind the fifth ground for termination for intimidating and harassing members of the public. He was informed that these were people from whom he had collected debts. Hadad then asked if these were the same two individuals against whom he had taken action when he filed in small claims court and, when he was told that they were the same individuals, Hadad responded indicating that he understood who these individuals were (Village Council Hrg. Mayor's Exhibit 25C). *Loudermill* and its progeny do not require any more than adequate explanation of the reasons for the employer's action. *Collyer*, 98 F.3d at 224. *Collyer* serves as a recent example of adequate explanation of the extent of the evidence that must be provided. It was sufficient for the employer to orally inform the employee that he was discharged as unfit for duty based upon a doctor's determination that he suffered from a mental condition without actually providing the employee with a copy of the doctor's detailed report. *Id.*

■ Hadad was not provided with a copy of Police Chief Clark's April 15, 1986 letter to Mayor Croucher. Nonetheless, the specific reasons for discharge were incorporated in Mayor Croucher's eight grounds for discharge. These grounds for the most part were not vague. They specifically refer to: misuse of the LEADS computer on August 4, 1985 regarding Councilman Charles Mellen; misuse of the LEADS computer terminal on September 17, 1985 with regard to Antonia Hadad; and misuse of the LEADS computer on January 6, 1986 regarding Francisco DiBlasio. The fourth, fifth and sixth reasons refer to Hadad's debt collection business, which obviously Hadad knew about. The seventh reason referred to unauthorized practice of law in filing pleadings with the Bedford Municipal Court on behalf of Peter's Store for Men and Women between June 1, 1985 through November 1, 1985. The eighth reason refers to the witness fees received by Hadad in the case *Orrico v. Geier*, Case No. 61581 during November 1985. Although Hadad did prod for divulgence of the evidence against him concerning the ground of intimi-

dation and harassing members of the public in furtherance of his debt collection business, he did receive adequate reply on which Hadad could identify these two individuals. The remaining allegations concerning debt collection were filled in by the reference to pleadings filed with the Bedford Municipal Court, about which Hadad would have known. The written notice of the charges was sufficiently specific to inform Hadad of the employer's evidence, except the evidence concerning some of the debt collection activities. Hadad, though, was given sufficient explanation at the pre-termination hearing which compensated for these less detailed grounds. Consequently, under the circumstance of this case, the employer's duty under *Loudermill* was fulfilled because Hadad did receive an oral or written notice of the charges, an explanation of the employer's evidence and had the opportunity to respond or present his side of the story.

Furthermore, Hadad has not sustained his arguments concerning the pre-termination hearing with respect to the Village or the other defendants. "An official who does not participate in or attend the hearing cannot be said to have contributed to its alleged inadequacies." *Bettio,* 775 F.Supp. at 1563 n. 12. Since the other individual defendants were not present and involved in Mayor Croucher's pre-termination hearing, neither the Village Council nor the Village itself can be brought in merely on a theory of *respondeat superior.* Also Police Chief Clark also did not participate in the pre-termination hearing. Consequently, there was no violation of procedural due process based upon the alleged inadequate explanation of the employer's evidence.

Finally, Hadad argues that his right to procedural due process was violated because Mayor Croucher and the Village of Moreland Hills violated a clearly established right not to punish or discharge an employee for violation of the undisclosed rules and regulations. This contention is not supported by the record. As explained previously, there was substantial evidence on which reasonable minds could conclude that Hadad had engaged in prohibited activity for which he could be discharged, and that he knew that these ac-

tivities were prohibited. Moreover, the basis for discharge in the Village Charter includes "just cause." Hadad's liberty or property interest in employment was not conditioned upon discharge solely based upon violations of the Rules and Regulations of the Police Department of the Village of Moreland Hills.

■ Ultimately, moreover, Hadad's arguments concerning procedural due process must fail because Hadad has not demonstrated inadequate review process of the state administrative procedure in order to pursue a procedural due process claim under § 1983. *Meyers v. City of Cincinnati,* 934 F.2d 726, 731 (6th Cir.1991); *Sutton v. Cleveland Bd of Educ.,* 958 F.2d at 1349; *Collyer v. Darling,* 98 F.3d at 227. In *Collyer,* the court found that Ohio provided adequate review of state administrative procedures involving the discharge of a public employee, including mandamus review to compel payment of back pay. Moreover, the court cannot overlook that initially Hadad had appealed his termination under Ohio Rev.Code § 2506.01 to the Cuyahoga County Court of Common Pleas. Added to this is the fact that Hadad does not claim that any administrative error, either pre-termination or post-termination, resulted in a denial of state judicial remedies. *Compare Sutton v. Cleveland Bd. of Educ.,* 958 F.2d at 1349–50. In Hadad's situation, there was no administrative error which prejudiced his exercise of state provided judicial review remedies. Consequently, summary judgment must be entered for the defendants on Hadad's claims of procedural and substantive due process violations under § 1983.

*Third Cause of Action:*

In his third and final cause of action, Hadad alleges that the conduct of defendants was intentionally and maliciously injurious to his reputation and caused him to suffer a stigma to his good name, loss of earning power and professional standing. On November 8, 1988 Judge White dismissed the individual council members from this defamation claim based on privilege accorded to statements made during the course of legislative proceedings. Police Chief Clark, Mayor Croucher and the Village of Moreland Hills itself remained as defendants. Moreover, it

was clear from Judge White's reference to *Sorin v. Bd. of Ed. of the City School Dist. of Warrensville Heights,* 464 F.Supp. 50, 53 (N.D.Ohio 1978), that the court and the parties construed this third cause of action as a common law tort of defamation. This is reinforced on the face of the pleading itself because there is no reference to a constitutional ground or to § 1983 in the paragraphs describing the third cause of action. Consequently, the court need not concern itself with the civil rights defamation claim under § 1983. *Compare Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). (Liberty interest against governmental action inflicting stigma to reputation impairing future employment opportunities.)

■ The central question remaining is whether Mayor Croucher's and Police Chief Clark's reasons for discharge were true. See *Solomon v. Royal Oak Twp.,* 842 F.2d at 867. Defamation in Ohio is generally governed by statute and pursuant to Ohio Rev.Code § 2739.02, "the defendant may allege and prove the truth of the matter charged as defamatory. Proof of the truth thereof shall be a complete defense." During the course of deposition, Hadad admitted the truth of the eight allegations which served as grounds for Mayor Croucher's discharge:

Q I am going to ask you now, Mr. Hadad, to review Exhibit B and tell me which of the eight allegations you may have committed.

A I committed them all.

(Dep.Hadad, pg.210, Dkt.215).

Hadad's admission at deposition that he had "committed" the eight alleged infractions supports the defendant's position that they were true. Consequently, defendants are entitled to summary judgment on the third count of the complaint.

### CONCLUSION

Based upon review of the motions, briefs, affidavits and depositions, summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure must be entered on the defendants' motions for summary judg-

ment with respect to the second and third causes of action stated in the complaint (Docket Nos. 182, 211, 217). Plaintiff Hadad's motion for partial summary judgment on the second cause of action must be denied (Docket No. 218). However, with respect to the first cause of action, only partial summary judgment may be entered. Mayor Croucher, Police Chief Clark and the individual Village Council members are protected from an award of monetary damages by qualified immunity against the allegations in the first cause of action. Nonetheless, qualified immunity does not shield them from the injunctive relief sought by Hadad in the complaint, nor is the Village itself protected against an award of monetary damages due to an arguable official municipal policy. Finally, Police Chief Clark's motion for dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure must be denied (Docket No. 223).